UNSWORN DECLARATION UNDER PENALTY OF PERJURY

1. I, Giuseppe De Andrè, am a person of the full age of majority, residing at 34 C.so Italia, 16145 Genova, Italy;

2. I have been employed by SOCIETA' COMMERCIALE E FINANZIARIA S.R.L. since April 3rd, 2014 as Director and have access to all of SOCIETA' COMMERCIALE E FINANZIARIA S.R.L. records;

3. I have personal knowledge of the facts recited herein;

4. At all pertinent times, SOCIETA' COMMERCIALE E FINANZIARIA S.R.L. was and remains a corporation organized and existing under the laws of Italy, with its registered office at Piazza della Vittoria 9/1, 16121 Genoa, Italy;

5. SOCIETA' COMMERCIALE E FINANZIARIA S.R.L. is a time charterer of the M/V Pedhoulas Farmer, a Cyprus flag vessel bulk carrier with a length overall of 229 m and breadth of 32.26m;

6. SOCIETA' COMMERCIALE E FINANZIARIA S.R.L. time chartered the M/V Pedhoulas Farmer from Maxeikosiena Shipping Corporation on 22 October 2015;

7. A copy of the Fixture Recap of the time charter party between Maxeikosiena Shipping Corporation and SOCIETA' COMMERCIALE E FINANZIARIA S.R.L. is attached to this Declaration as Exhibit A.

8. SOCIETA' COMMERCIALE E FINANZIARIA S.R.L. sub-time chartered the M/V Pedhoulas Farmer to ADM Intermare, a division of ADM International Sàrl, located at A One Business Center, La Pièce 3, CH-1180 Rolle, Switzerland on 22 October 2015.

9. A copy of the Fixture Recap of the time charter between SOCIETA' COMMERCIALE E FINANZIARIA S.R.L. and ADM Intermare is attached to this Declaration as Exhibit B.

10. Pursuant to the SOCIETA' COMMERCIALE E FINANZIARIA S.R.L. - ADM Intermare time charter, ADM Intermare was responsible for bunkering the vessel during the charter period and to pay for the value of the bunkers aboard the vessel at delivery, when the vessel passed Gibraltar, on or about 24 October 2015.

11. In fact, ADM Intermare did pay for the bunkers when it made its first charter hire payment to SOCIETA' COMMERCIALE E FINANZIARIA S.R.L. on October 26th,2015 , as shown by the attached documents, Exhibit C.

EXHIBIT 1

12. When the M/V Pedhoulas Farmer arrived in the Mississippi River to load a grain cargo in November 2015 and through the date of this Declaration, all bunkers aboard the M/V Pedhoulas Farmer have been and are owned by ADM Intermare.

13. On 21 November 2015, the M/V Pedhoulas Farmer's bunkers were attached in the lawsuit entitled "JALDHI OVERSEAS PTE LTD., VERSUS UNITED BULK CARRIERS INTERNATIONAL LTDA., in personam, and THE MASTER OF THE M.V. PEDHOULAS FARMER and NORTON LILLY INTERNATIONAL, as garnishees" Civil Action Number 2:15-cv-06148-CJB-DEK in the United States District Court for the Eastern District of Louisiana based on the plaintiff's allegation that United Bulk Carriers International owned the bunkers aboard the M/V Pedhoulas Farmer, but that allegation is absolutely false and incorrect.

14. United Bulk Carriers International is not a charterer of the M/V Pedhoulas Farmer.

15. United Bulk Carriers International does not have any ownership interest in the bunkers currently aboard the M/V Pedhoulas Farmer as those bunkers were previously owned by SOCIETA' COMMERCIALE E FINANZIARIA S.R.L. before it delivered the vessel to ADM Intermare on 24 October 2015 and ADM Intermare became the owner of the bunkers on or about 26th October 2015.

16. ADM Intermare was the sole owner of the bunkers aboard the M/V Pedhoulas Farmer at all times while the vessel has been in the Mississippi River in November 2015, including when the attachment writ was served on the vessel's Master on 20 November 2015.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on the 23 day of November 2015 at Genova, Italy

Signature: _____

Printed Name: Giuseppe De Andrè

Società Commerciale e Finanziaria S.r.l.
Piazza della Vittoria, 9/1
16121 - Genova - Italia

EXHIBIT 1

Da: "Betto BONINO" <panamax@ifchor.ch>
Data: 14 agosto 2015 18:12:59 CEST
A: voodale@hotmail.com
Oggetto: re pedhoulas farmer/scf
Doc-No. 16242546   14/AUG/2015 (FRI)  18:12  (+0200)  BBO

IFCHOR SA, Lausanne, Switzerland

To scf - Att. Francesco


re pedhoulas farmer/scf
=


further our previous exchanges other the phone, pls to recap clean fixture cp dd 14/08/15 as
flw:


pedhoulas farmer
tc desc attached

altern speeds (wog) ballast abt 13,5mt knt on abt 30+ 2mt - laden abt 13kts on abt 33+2


Owners to confirm and/or advise all following points:

1)      Vessel is fully first class (IG) P&I covered , and ITF or equivalent fitted for the duration of
this charter.
2)      Vessel is classed highest Lloyd's or equivalent (IACS), and shall so remain throughout the
currency of this charter.
3)      Vessel is strengthened for heavy cargoes and capable of alternate loading
4)      Vessel/head owners are fully ISM certified and shall so remain throughout the currency
of this charter. Bimco ism clause to be part of TCP.
5)      Vessel holds/hatces are clear and unobstructed without centerline bulkhead and fully
suitable for grab/mechanical discharge
6)      Vessel is full ISPS fitted. Bimco ISPS and Bimco AMS clauses to be part of tcp.



1

7)     Final clean recap has to include Hire Beneficiary full style (c/o not acceptable), failing which Charterers not to be responsible for timely remittances.

8)     Vessel is not blacklisted for loading in RBCT and Australia (Including but not limited to Newcastle)

9)   delete.

10)  Vessel is capable of maintaining throughout loading/discharging operations a maximum distance WLTHC in full ballast conditions including H4 ballasted;

   NO7. 13,85 M  N. – NO.4 14,70M – NO.1 15,50M

11)  Vessel has a  total  18  mooring ropes on board  or alternatively can double existing ropes .

12)  Vessel is Rightship/BHP Billiton approved. Ows guarantee vessel will remain Rightship recommended during the currency of this charter.

13)  Ows gtee they will immediately inform chrs as soon as a PSC inspection is carried out and that psc inspection outcome will be passed to chrs as soon as available.


14)  ) in case chrs need to perform hold  cleaning with shore gangs, ows gtee vessel will be able to accommodate up to 6 people on board during short sea passages en route to next loading port. full cleaning gang always to be allowed to work 24 hrs shinc on board when in port/anchorage.

15)  vessel can load grain/grain prods w/o any extra lashing/securing – sub vessels trim/stress/stability criteria are satisfied.

16)  owners guarantee vessel will be able to transit panama canal with a maximum tfwd of 39'06" at the deepest point of immersion.

17)tanks used for lsmgo:

   no3 hfo(s): 230m3
   mdo stor 3: 80m3
   mdo serv:   20m3
   mdo sett/serv:30m3


   total 360m3 (85pct)

18) tanks arrangement (85pct):


hfo tanks
=========
no1 hfo (s): 420m3
no1 hfo (p): 420m3
no2 hfo (s): 420m3
no2 hfo (p): 420m3
no3 hfo (p): 375m3
no2 hfo serv: 23m3
no2 hfo sett: 35m3

lsmgo tanks
===========
see above reply for no17

mdo tanks
=========
mdo stor 1: 19m3
mdo stor 2: 62m3
mdo stor 4: 70m3

tanks that can be used also for hfo
=================================
no1 hfo serv: 23m3
no1 hfo sett: 23m3

19)  owners guarantee vessel is in compliance with latest imo/uscg regulation in terms of ballast water treatment.

20)  owners confirm vessel is equipped with a tank capable of min 300 mt to store residual water of holds washing.

21)  vessel not black listed by enel under their vetting questionnaire and to hold a minimum of three rightship stars throughout the entire duration of this charter.

22)  vessel is guaranteed capable at any time with max 2 holds slack always subject to vessel stability booklet and solas regulations.

23)  owners guarantee that as from they will become effective, owners/vessel will be in compliance with chinese laws and regulations in respect of financial responsibility for oil pollution, including and not limited to the existence of a contract with an approved contractor as listed by chinese competent authority.

25)  owners confirm vessel will keep her position constantly updated via ais with no interruption.

28)  owners confirm vessel in possession or can obtain latest on arrival loading port where required, a dual dwat certificate of up to max 69.999 mt. – expenses  for the installation
     of new load line/restoration of the original for charts a/c

29)  as per cp clause 80 - owners confirm vessel is fully ITF covered - never had any issue i argentina  or elsewhere.

30)  as per cp

31)  as per cp

32)  in case ifo 380 cst is not available, chrs can bunker the vessel with ifo 180 cst always w/i rme 25 specs.

33)  in case of vessel bunkering in rsa, chrs have the option of bunkering vessel with ifo rmf 25.

34)  split of bills of lading clause and seaway bills clause to be included in this cp.

35) soya bean meals and soya bean pellets are always to be permitted. however, appropriate certificate stating that intended cargo and its moisture and fat contents are not such as to fall under the provisions of imo code app. b, have to be provided to master /owners prior loading.

36) delete

37) vessel is suitable for iron ore loading - have called/loaded iron ore in ponta du ubu jan 2013 and tubarao november 2013.

38) delete

39) in case of calling us ports, any compulsory extra watchmen required due to crew nationality or any expense required to obtain crew visa, including extra compulsory watchmen if required by local custom/port regulations, to be for owner's account.

40) unless with charterer's prior consent, vessel will burn ulfo/lsmgo only in areas where use of ulfo/lsmgo is compulsory. bimco bunker sulphur clause 2005 to apply

41) speed and consumptions of the vessel as per description are representations by the owners and are a continuous warranty throughout this charter.

42) in case ows/vsl will not be in compliance with the above guarantees, vessel will
   be off hire from occurence of the non compliance until rectification of same and
   any vessel's expenses incurred shall be for owners account.


bank details for hire remittances

beneficiary: maxeikosiena shipping corporation
commonwealth bank of australia, london (swift: ctbagb2l)
account no. 085036-usd-2408-01
iban:  gb30ctba60953808503601
correspondent bank: bank of new york mellon, new york (swift: irvtus3n)


vsl's contact dets
------------------
tel: 00870 773234229 / 773234228
fax: 00870 783207549
email: ped.farmer@gtships.com


no chain/owners: maxeikosiena shipping corporation


last 3 cargoes starting from the most recent are:
coal
canola

soya beans

for

- acc Società Commerciale Finanziaria Srl
via Filippo Turati 26,
20121, Milano
- del dlosp krishnapatnam atdnshinc
- lay/can 16/23 aug 2015 - 00h01/23h59 lt
in case vsl ll sail over the weekend, pls instruct the vsl to sail at 11.50 knts toward rbay as per routing attached/agreed
- 1 tc period  of min/max 5/8 mos in chopt, trading always via sps sbs sas aa awiwl - naabsa allowed in grain ports bzl/argentina/uruguay as per nype cl.6
- hire usd 9,100 diot inclot per day or pro rata to be paid every 15 days in advance. 1st hire plus value of bunkers on dely  to be paid within 3 banking days after delivery.
- ows confirm the vssl on dely will proceed towards rbct as per attached routing without any extra cost for chrts acct provided vsl stays within hra max 5 days, if more than 5 full days exceeded then ap to be upto max usd 12000 for charts a/c always against original invoices.
- redelvery dlosp or passing wb skaw/cape passero rge incl uk/eire/morocco or pmo/japan rge atndschinc
- bunker cl
  on dely abt 1639 mt hfo and abt 145 mt lsmgo
  abt same qties on redely
  prices bends usd 280pmt hfo and usd 480 pmt lsmgo
- holds cleanig clause - as per cp
- ilohc 5000 lpsum on redel
- intermediate usd 4000 after grains and usd 4500 after non grains
- owners have the right to become "disponent" ownerswith all other terms, conditions, rights and obligations of the owners under this charter party including the management to remain unaffected
- 3.75 pct adc + 1.25 pct ifchor
- owise as per owners executed cp attached logically amended per mterms agreed with flwing alterations:

line 56 delete "30"

line 133 - delete

cl 36:

"murmansk/kirkeness/narvik allowed fm 1st march till 31st december"
add "baltic trading to be ruled as per gentlemen agreement verbally discussed/agreed"
add "first intended ballast leg towards south africa to be ruled as per main terms recap and will not count as hra transit, thus 3 further hra transit to remain at chrts disposal"

ref last para vssl consumption bss  12knots: ballast abt 23 mt = laden abt 28mt

insert "ebola affected countries as defined by who organization excluded fm trade. max 2 (two) call in port kamsar allowed however any delays and/or expenses if any, at next dicharging port only owing to call at kamsar to be for charterers account".

in page 8 under heading "security guards" 1 b (i) delete  "goat,pvi,mast" - add " aspida, secure a ship, sea marshall". and "the choice of relevant ssp to be mutually agreed between ows and chrts"

cl 72 add "petcoke can be last cargo prior vssl redelivery in which case ilohc to apply to be usd 20,000

end


trust above recap is in accordance with yr notes; should you notice any errors or omissions please advise in writing by return as otherwise shall assume same is in good order.


tnx and brgds to both parties


****** AS BROKERS ONLY ****************** E. & O. E.******

  IFCHOR SA, Place Pépinet 1, 1003 Lausanne, Switzerland

  capes@ifchor.ch -  panamax@ifchor.ch   -  handy@ifchor.ch
  operations@ifchor.ch - capesops@ifchor.ch

Tel: +41 21 310.31.31 - Fax: +41 21 310.31.00/01 - www.ifchor.com

*************************************************************

# Time Charter

GOVERNMENT FORM
*Approved by the New York Produce Exchange*
November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd 1946



1  THIS CHARTER PARTY, made and concluded in *Geneva this 22nd* day of *August 19 2014*
2  Between *Messrs, MAXEIKOSIENA SHIPPING CORPORATION,, Liberia*
3  Owners of the good *Cyprus flag* Steamship/Motorship *"PEDHOULAS FARMER" (Description see Clause 54)* of....
4  of .... tons gross register, and .... tons net register, having engines of .... indicated horse power
5  and with hull, machinery and equipment in a thoroughly efficient state, and classed ....
6  at .... of about .... cubic feet bale capacity, and about .... tons of 2240 lbs.
7  deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity,
8  allowing a minimum of fifty tons) on a draft of .... feet .... inches on .... Summer freeboard, inclusive of permanent bunkers,
9  which are of the capacity of about .... tons of fuel, and capable of steaming, fully laden, under good weather
10  conditions about .... knots on a consumption of about .... tons of best Welsh coal — best grade fuel oil — best grade Diesel oil,
11  now *See attached description* ....
12  .... and *Messrs, CARGILL INTERNATIONAL S.A. as* Charterers of the City of *Geneva*
13  WITNESSETH, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for
14  about *a time charter period of minimum 11 to maximum 14 months in Charterers' option or in Charterers' option declarable 3 working days after delivery, for a time charter period of about 12 to about 14 months in Charterers' option ("about" means 15 days more or less in Charterers' option), trading world wide, always via safe port(s), safe berth(s), safe anchorage(s), always afloat, always within INL, Charterers' option NAABSA in grain ports Brazil/Uruguay/Argentina only as per Clause 6.*
15  ............within below mentioned trading limits.
16  Charterers to have liberty to sublet the vessel - *See Clause 99* for all or any part of the time covered by this Charter, but Charterers remaining responsible for
17  the fulfillment of this Charter Party.
18  Vessel to be placed at the disposal of the Charterers, at *on dropping last outward sea pilot Tianjin, any time, day or night, Sundays, Holidays included*
19  ....................
20  in such dock or at such wharf or place (where she may safely lie, always afloat, at all tides of tide, except as otherwise provided in clause No. 6), as
21  the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5. Vessel's *holds on her arrival first loadport to be clean/swept and dry as required for intended cargo failing which vessel to be offhire until she can be approved by independent surveyor (see Clause 38)* on her delivery to be
22  ready to receive cargo with clean-swept holds and *and vessel to be* tight, staunch, strong and in every way fitted for the service, *and so maintained by Owners throughout the period of this Charter Party* having water ballast, winches and
23  donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same
24  time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying *cargoes as per Clause 72 trading to be worldwide, always afloat, always within Institute Warranty Limits and always via safe berth(s), safe port(s), safe anchorage(s), vessel to remain always within ice free ports, not to force ice or follow ice breakers - BIMCO ICE Clause paragraph B, C, D to apply, as per Clause 36* lawful merchan-
25  dise, including petroleum or its products, in proper containers, excluding ........
26  (vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,
27  all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North
28  America, and/or United States of America, and/or West-Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or
29  Mexico, and/or South America .......... and/or Europe
30  and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between
31  October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic;
32  ..............
33  ..............
34  ..............
35  as the Charterers or their Agents shall direct, on the following conditions:
36  1. That the Owners *whilst on hire* shall *throughout the period of this Charter Party* provide and pay for all provisions *including lubricating oil, fresh water (see Clause 32),* wages and consular shipping and discharging fees of the Crew; shall pay for the
37  insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep
38  the vessel in a thoroughly efficient state in hull, *cargo spaces,* machinery and equipment *with all certificates to comply with current regulations at all ports of call* for and during the service.
39  2. That the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, Pilotages, *(which under this Charter Party includes compulsory and recommended by IMO on Master's request i.e. Dardanelles, Bosphorus, full Skaw, full Magellan, Great Barrier Reef, Torres Straits, etc.)* Agencies, *boatage on Charterers' business, agencies for clearance and cargo purposes only,* Commissions,
40  Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into
41  a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of
42  illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this
43  charter to be for Charterers account. All other fumigations to be for Charterers account after vessel has been on charter for a continuous period
44  of six months or more.
45  Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but
46  Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards
47  for dunnage, they making good any damage thereto.
48  3. *See Clause 49* That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on
49  board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than ........ tons and not more than .......
50  ........ tons and to be re-delivered with not less than ....... tons and not more than ....... tons.

51 4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of *See Clause 46*

52 ........*in* United States Currency *commencing on and from the day of her delivery.* ~~per-ton-on-vessel's-total-deadweight-carrying-capacity,-including bunkers-and~~

53 ~~stores,-on-~~ ....... ~~summer freeboard, per Calendar Month, commencing on and from the day of her delivery,~~ as aforesaid, and at

54 and after the same rate for any part of a *day* ~~month;~~ hire to continue until the *time* ~~hour~~ of the day of her re-delivery in like good order and condition, ordinary

55 wear and tear excepted, to the Owners (unless lost) ~~at~~ *on dropping last outward sea pilot, one safe port in Charterers' option within the following ranges any time, day or night, Sundays, Holidays included: 1. Singapore/Japan range including South Korea/PRC/Taiwan/Philippine Islands/ Indonesia/Malaysia/Thailand/Vietnam 2. Skaw/Passero range including UK/Continent/Eire/Morocco or passing either westbound 3. PMO/Japan range including India*

56 ........ unless otherwise mutually agreed. Charterers are to give Owners not less than ~~days~~ *30 days approximate*

57 ~~notice-of-vessels-expected-date-of-re-delivery~~ *notice of vessel's expected date of redelivery notice, followed by 20/15/5/3/2/1 days notice of vessel's expected date of redelivery* and probable port.

58 5. Payment of said hire to be made *See Clause 50* ~~in-New-York-in-cash~~ in United States Currency, *every 15 days* ~~semi-monthly~~ in advance, *less commission* and for the last *15 days* ~~half-month~~ or

59 part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes

60 due, if so required by Owners, unless bank guarantee ~~or deposit~~ is made by the Charterers, otherwise failing the punctual and regular payment of the

61 hire, or bank guarantee, or on any breach of this Charter Party *(always in line with and subject to Clause 50)*, the Owners shall be at liberty to withdraw the vessel from the service of the Char-

62 terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. ~~Time-to-count-from-7 a.m.-on-the-working-day~~

63 ~~following-that-on-which-written-notice-of-readiness-has-been-given-to-Charterers-or-their-Agents-before-4 p.m., but-if-required-by-Charterers, they~~

64 ~~to-have-the-privilege-of-using-vessel-at-once, such-time-used-to-count-as-hire.~~

65 Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject

66 to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application

67 of such advances.

68 6. That the cargo or cargoes be laden and/or discharged in any dock or at any wharf or place that Charterers or their Agents may

69 direct, provided the vessel can safely lie always afloat at any time of tide, ~~except-at-such-places-where-it-is-customary-for-similar-size-vessels-to-safely~~

70 ~~lie-aground.~~ *NAABSA to be applied in grain ports, Brazil/Uruguay/Argentina only.*

71 7. That the whole reach of the Vessel's Hold, ~~Decks,~~ and usual places of loading (not more than she can reasonably stow and carry), also

72 accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,

73 tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers-have-the-privilege-of-passengers-as-far-as-accommodations-allow,-Charterers~~

74 ~~paying-Owners-~~ ....... ~~per-day-per-passenger-for-accommodations-and-meals. However, it-is-agreed-that-in-case-any-fines-or-extra-expenses-are~~

75 ~~incurred-in-the-consequences-of-the-carriage-of-passengers,-Charterers-are-to-bear-such-risk-and-expense.~~

76 8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and

77 boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and

78 agency; and Charterers are to load, stow, ~~and~~ trim *and discharge* the cargo at their expense under the supervision of the Captain, who is to sign Bills of Lading *or Waybills (See Clause 114)* for

79 cargo as presented, in conformity with Mate's or Tally Clerk's receipts.

80 9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on

81 receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

82 10. That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted

83 with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, ~~Charterers-paying-at-the~~

84 ~~rate-of-$1.00-per-day.~~ Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally

85 Clerks, Stevedore's Foreman, etc., Charterers paying *See Clause 64* ~~at-the-current-rate-per-meal,-for-all-such-victualling.~~

86 11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the

87 Captain shall keep a full and correct Log of the voyage or voyages, which are to be *made available* ~~patent~~ to the Charterers or their Agents, and furnish the Char-

88 terers, their Agents or Supercargo, when required, with a true copy of daily *deck and engine* Logs *in English on Charterers' forms*, showing the course of the vessel and distance run and the con-

89 sumption of fuel.

90 12. That the Captain shall use diligence in caring for the ventilation of the cargo.

91 ~~13. That the Charterers shall have the option of continuing this charter for a further period of~~ .......

92 ...........................................................................................................

93 ~~on-giving-written-notice-thereof-to-the-Owners-or-their-Agents-~~ ....... ~~days-previous-to-the-expiration-of-the-first-named-term,-or-any-declared-option.~~

94 14. That if required by Charterers, time not to commence before *01st September 2014, 00:01 hours* and should vessel

95 not have *been delivered* ~~given-written-notice-of-readiness~~ on or before *10th September 2014, 24:00 hours – Vessel ready about 31st August ex grains discharge* ~~but-not-later-than-4 p.m.~~ Charterers or

96 their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness. *Owners to give approximately 5/3/2/1 days notice of delivery to Charterers.*

97 15. That in the event of the loss of time from *default and/or* deficiency of men *including strike of officers and/or ratings or deficiency* or stores, fire, breakdown or damages to hull, machinery or equipment,

98 grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, *on account of vessel's non-compliance with government and/or state and/or provincial regulations pertaining to water pollution*, or by any other cause

99 preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by

100 defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence

101 thereof, and all ~~extra~~ *vessel's* expenses shall be deducted from the hire.

102 16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be

103 returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,

104 Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

105 The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the

106 purpose of saving life and property.

107 17. *See Clause 47* ~~That-should-any-dispute-arise-between-Owners-and-the-Charterers,-the-matter-in-dispute-shall-be-referred-to-three-persons-at-New York,~~

108 ~~one-to-be-appointed-by-each-of-the-parties-hereto,-and-the-third-by-the-two-so-chosen;-their-decision-or-that-of-any-two-of-them,-shall-be-final,-and-for~~

109 ~~the-purpose-of-enforcing-any-award,-this-agreement-may-be-made-a-rule-of-the-Court. The-Arbitrators-shall-be-commercial-men.~~

110 18. That the Owners shall have a lien upon all cargoes, and all sub-freights, *sub-hires or bunkers* for any amounts due under this Charter, including General Aver-

111 age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess

112 deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which

113 might have priority over the title and interest of the owners in the vessel.

114 19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and

115 Crew's proportion. General Average shall be adjusted, stated and settled, *in London. English Law to apply* according to ~~Rules 1 to 15, inclusive, 17 to~~

116 ~~22, inclusive, and Rule F of~~ York-Antwerp Rules *as amended 1990* ~~1924~~, *See New Jason Clause as attached.* ~~at such port or place in the United States as may be selected by the~~

117 ~~carrier, and as to matters not provided for by these~~ ~~Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into~~

118 ~~United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at~~

119 ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~

120 ~~bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier~~

121 ~~or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if~~

122 ~~required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the~~

123 ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the~~

124 ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~

125 ~~United States money.~~

126 ~~In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever,~~

127 ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~

128 ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~

129 ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~

130 ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~

131 ~~ships belonged to strangers.~~

132 Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.

133 20. Fuel used by the vessel while off hire *to be agreed to as to quantity, and the costs of replacing same, to be allowed by Owners. No deductions for domestic consumption.* ~~also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity, and the~~

134 ~~cost of replacing same, to be allowed by Owners.~~

135 21. *See Clause 88* ~~That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~

136 ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from~~

137 ~~time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~

138 ..............................

139 ..............................

140 22. ~~Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks) capable of handling lifts up to three tons, also~~

141 ~~providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for~~

142 ~~same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel lanterns and oil for~~

143 ~~night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense. The~~

144 ~~Charterers to have the use of any gear on board the vessel.~~

145 23. Vessel to work night and day, *weekends, holidays included* if required by Charterers, *vessel to provide electric light for night work as on board* ~~and all winches to be at Charterers' disposal during loading and discharging;~~

146 ~~steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen,~~

147 ~~deck-hands and donkeymen for overtime work done in accordance with the working-hours and rates stated in the ship's articles. If the rules of the~~

148 ~~port, or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or~~

149 ~~insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned~~

150 ~~thereby.~~

151 24. ~~It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained~~

152 ~~in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,~~

153 ~~etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both~~

154 ~~of which are to be included in all bills of lading issued hereunder:~~

155 ..............................U.S.A. Clause Paramount~~

156 ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April~~

157 ~~16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of~~

158 ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading~~

159 ~~be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~

160 ..............................Both to Blame Collision Clause~~

161 ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~

162 ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~

163 ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss~~

164 ~~or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-~~

165 ~~carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her~~

166 ~~owners as part of their claim against the carrying ship or carrier.~~

167 25. The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-

168 drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the

169 port or to get out after having completed loading or discharging. *Bimco Ice Clause (paragraphs: B, C, D) as attached to apply.*

170 26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the

171 navigation of the vessel, *acts of pilots, tugboats,* insurance, crew, and all other matters, same as when trading for their own account.

172 27. A commission of ~~2 1/2~~ *1.00* per cent is payable by the Vessel and Owners to *ACROPOLIS CHARTERING AND SHIPPING INC.,*

173 ..............................

174 on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

175 28. An address commission of ~~2 1/2~~ *3.75* per cent payable to *Charterers.......* on the hire earned and paid under this Charter.

# FIRST ORIGINAL

*Clause 28 to 120 appended herewith are deemed fully incorporated in this Charter Party.*

THE OWNERS:                                        THE CHARTERERS:

**By authority of the Owners
for and on behalf of,**

SAFETY MANAGEMENT OVERSEAS S.A.
32 Avenue Karamanli
PO BOX 70837 - 16605
Athens, Greece
Telephone (+30) 210 895 7070

**Safety Management Overseas S.A.**

CARGILL INTERNATIONAL SA
14 chemin De Normandie
Case postale 383
CH-1211 GENÈVE 12

"This Charter Party is a computer generated copy of the NYPE 46 form printed by authority of the Association of Ship Brokers & Agents (U.S.A), Inc. (ASBA), using software which is the copyright of Chinsay AB ("Chinsay"). Any insertion or deletion to the form must be clearly visible. In the event that any modification is made to the preprinted text of this document, and is not clearly visible, the provisions of the original ASBA-approved document shall apply. ASBA and Chinsay assume no responsibility for any loss or damage caused as a result of discrepancies between the original ASBA-approved document and this document."



## **ADDITIONAL CLAUSES**

### **Clause 28 :**
Deleted.

### **Clause 29 :**
Deleted.

### **Clause 30 - On/Off Hire Survey :**
Charterers to appoint a Surveyor acting on their behalf for performing a joint on and off-hire bunker survey as well as a full condition survey. Joint on-hire bunker and condition survey to be in Owners' time and joint off-hire bunker and condition survey to be in Charterers' time. Expenses to be shared 50/50. Vessel will only be off-hire provided time is actually lost.

### **Clause 31 :**
Charterers' option to redeliver the vessel unclean against paying Owners' lumpsum of US$ 5,500 in lieu of hold cleaning.

### **Clause 32 :**
Crew to assist in cleaning holds between voyages where requested to do so at their best, but cleaning always subject to duration of ballast voyage and weather conditions. Owners not to be responsible for passing of subsequent holds surveys and vessel to remain on hire. It is understood such hold cleaning always provided shore regulations permitting and any materials/chemicals/fresh water used to be for Charterers' account.

Intermediate holds cleaning:
US$ 4,500 after non grains;
US$ 4,000 after grains;

### **Clause 33 :**
Owners shall arrange necessary International Certificates including but not limited to US Coast Guard Certificates enabling vessel to trade United States waters during the currency of the Charter Party period. Owners warrant to provide and maintain at their expenses and carry on board the vessel a valid US Federal Maritime Commission's Certificate of Financial Responsibility as required under the US Water Quality Act of 1970 and amendments thereto. In no case shall the Charterers be liable for any damages as a result of the Owners' failure to obtain the aforementioned certificates or the Owners' non-compliance with present Water Pollution Legislation enacted by individual US States. Owners warrant that they are covered for pollution liability insurance upto 1 billion US Dollars.

It is a condition of this Charter Party that the Officers and crew of the vessel are covered for the duration of this Charter Party by an International Transport Workers Federation Agreement acceptable world wide or other Bona Fide Trade Union Agreement conforming to International Transport Workers Federation standards. Time lost by non-compliance to be considered as off-hire. In the event that the vessel is delayed by reason of boycotts, strikes, labour stoppages or other actions by the International Transport Workers Federation against the vessel due to employment conditions, time so lost shall be considered as off-hire.

Owners to supply valid deratization exemption certificate on delivery of vessel. Renewal cost of the same to be for Owners' account and if any time lost or vessel detained on account of renewal vessel to be off-hire.
Fumigation ordered because of illness of the crew to be for Owners' account. If Charterers require sanitary inspection for radio pratique in addition to deratization exemption certificate, renewal costs of the same to be for Charterers' account.

## Clause 34 :

In the event of loss of time due to blockade or detention of the vessel in any port of place by shore labour or others (whether arising from Government restrictions or not) by reason of:

a) The terms and conditions on which the members of the crew are employed.
b) Any physical or documentary deficiency in relation to the vessel's safety.

Payment of hire shall cease for the time thereby lost.

## Clause 35 :

Any delay, vessel's expenses or fines incurred on account of smuggling, if caused by the Officers, crew or other persons employed by the Owners, to be for Owners' account, but if caused by Agents or staff or supercargo of Charterers' same to be for Charterers' time and expense.

## Clause 36 - Trading Exclusions :

Trading area to be worldwide within Institute Warranty Limits but excluding Israel, all Russian Pacific ports, Iran, Iraq, Cambodia (Kampuchea), Cuba, Salvador, Congo (Brazzaville), Amazon, Orinoco, Somalia, Yemen, Liberia, North Korea, Alaska, Turkey, Turkey occupied Cyprus, East Timor, Nigeria, trading Saint Lawrence/East Coast Canada between 01 December - 30 April, trading north of Kiel Canal including Baltic between 01 December - 30 April, Lebanon, Syria, Iceland, Hudson Bay, Libya, Albania, Servia, Montenegro, Haiti, Ghana, Zaire, Burma, Tanzania, Namibia, Nicaragua, El Salvador, Georgia, Ethiopia, Guatemala, Angola, Bangladesh, Ivory Coast, Kenya, direct trading between People Republic of China and Taiwan and vice versa. War or warlikes zones and any countries banned and/or boycotted by U.S.A. or U.N. or prohibited by vessel's flag. Vessel will not be required to call above San Lorenzo but including Quebracho/Terminal 6 and Timbues.

Murmansk/Narvik/Kirkeness allowed 1st April to 1st December only.

Trading lower Baltic i.e. Denmark/Germany/Poland upto Klaipeda allowed provided port/area is ice free/ not to force ice, not follow ice breakers, BIMCO Ice Clause for Time Chartering (attached in C/P) to apply. No breach of IWL allowed in this Charter Party.

Notwithstanding anything agreed in this clause it is clearly understood that vessel will always trade within IWL.

Spitzbergen always excluded from trade.

Iran always excluded from trade.

- Vessel allowed to trade Magellan / Cape Horn at summer months only, i.e. October to May inclusive.

Vessel not to be employed on consecutive short haul trades.

- Owners to permit the vessel to call at ports which has been declared at risk of Asian Gypsy Moth by USDA or Canadian or other authorities.

After vessel's discharge and prior to vessel's leaving such port or latest prior vessel's arrival at next load port, provided last port of call is not the redelivery port under the Charter Party, a company, approved by USDA/Canadian/Australian authorities or authorities of country of next calling port, will perform a necessary inspection to declare vessel is clear and free of Asian Gypsy Moth and will issue a certificate of cleanliness at Charterers' time, risk and expense.
Should any fumigation be necessary then all time and costs including costs associated to crew transportation/accommodation ashore to be for Charterers' account until the vessel fully passes inspection and vessel to remain on hire.
If vessel is not accepted by USDA/Canadian or any other relevant authority as a result of call at such port then all expenses involved to be for Charterers' account and vessel to remain on hire.

Trading Gulf of Aden allowed 3 times during the currency of this Charter Party.

Amended BIMCO 2009 Piracy Clause to read as follows:

(a) If the Owners consent or if the vessel proceeds to or through an area exposed to the risk of piracy the Owners shall have the liberty:

(i) to take reasonable preventative measures to protect the vessel, her crew and cargo including but not limited to re-routeing within the area, proceeding in convoy, using escorts, avoiding day or night navigation, adjusting speed or course, or engaging security personnel or equipment on or about the vessel.

(ii) to comply with the orders, directions or recommendations of any underwriters who have the authority to give the same under the terms of the insurance.

(iii) to comply with all orders, directions, recommendations or advice given by the government of the nation under whose flag the vessel sails, or other government to whose laws the Owners are subject, or any other government, body or group, including military authorities, whatsoever acting with the power to compel compliance with their orders or directions; and

(iv) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement.

and the Charterers shall indemnify the Owners for any claims from holders of Bills of Lading or third parties caused by the vessel proceeding as aforesaid, save to the extent that such claims are covered by additional insurance as provided in sub-clause (b)(iii).

(b) Costs

(i) If the vessel proceeds to or through an area where due to risk of piracy additional costs will be incurred including but not limited to additional personnel and preventative measures to avoid piracy, such reasonable costs shall be for the Charterers' account. Any time lost waiting for convoys, following recommended routeing, timing, or reducing speed or taking measures to minimise risk, shall be for the Charterers' account and the vessel shall remain on hire.

(ii) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers.

(iii) If the underwriters of the Owners' insurances require additional premiums or additional insurance cover is necessary because the vessel proceeds to or through an area exposed to risk of piracy, then such additional insurance costs shall be reimbursed by the Charterers to the Owners.

(iv) All payments arising under Sub-Clause (b) shall be settled within fifteen (15) days of receipt of Owners' supported invoices or on redelivery, whichever occurs first.

(c) If the vessel is attacked by pirates any time lost shall be for the account of the Charterers and the vessel shall remain on hire.

(d) If the vessel is seized by pirates the Owners shall keep the Charterers closely informed of the efforts made to have the vessel released. The vessel shall remain on hire throughout the seizure and the Charterers' obligations shall remain unaffected, except that hire payments shall cease as of the three hundred and sixty first (361st) day after the seizure and shall resume once the vessel is released. The Charterers shall not be liable for late redelivery under this Charter Party resulting from seizure of the vessel by pirates.

(e) If in compliance with this clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party. In the event of a conflict between the provisions of this clause and any implied or express provision of the Charter Party, this clause shall prevail to the extent of such conflict, but no further.

HIGH RISK AREA TRANSIT
Notwithstanding any other provisions in this Charter Party, it is hereby agreed that Owners will permit the vessel to transit the high risk area (HRA) of the Indian Ocean / Arabian sea / Gulf of Oman / Gulf of Aden (maximum 3 times during the currency of this Charter Party) as defined by the joint war committee of Lloyds market association from time to time subject to the following terms and conditions:

### 1. Security Guards

a. Owners will employ an armed security team on board the vessel at their risk and expense (subject to 1(g) below).

b. Owners will contract with an SSP (Security Services Provider) recommended and vetted by Charterers and accredited by vessel's flag authorities and chosen from one of the following:

(i) GOAGT (Gulf of Aden Group Transits Limited), (ii) PVI (Protection Vessels International) or (iii) Mast. Charterers confirm that all the foregoing SSP are either accredited by the security association for the Maritime Industry (SAMI) and/or approved by leading underwriters of both LOH and K+R insurances.

c. The basis of the contractual arrangement between Owners and the SSP will be the BIMCO "Guardcon" contract with logical amendments approved by vessel's P+I Club.

d. The on board security team will be embarked and disembarked at the closest convenient locations to the entry and exit point of the HRA as provided by the chosen Security Services Provider.

e. The vessel will take a reasonably direct route at Master's discretion through the HRA from the embarkation point of the security team to the disembarkation point.

f. The chosen SSP will also arrange for required hardening materials (including full razor wire protection) for the vessel, not already on board, in accordance with BMP4 (Best Management Practices V. 4) to be supplied to the vessel prior to or at the same time as the embarkation of the security team. Such hardening materials to be installed by the crew under the direction of and verified by the security team.

g. Costs of the SSP (including provision of hardening materials) will be re-imbursed by Charterers to Owners promptly on presentation of usual supporting documentation. Owners will provide Charterers with a copy of the contract with the SSP upon request.

### 2. Insurance

a. Charterers will contract for LOH (loss of hire) insurance (including blocking and trapping) for a period not exceeding 360 days at their expense and will if requested include Owners as a co-insured beneficiary under their policy for such transit at no cost to Owners.
The vessel also will remain on-hire in the event of capture by pirates for a maximum of 360 days.

b. Charterers will contract for K+R (kidnap+ransom) insurance for an aggregate amount not exceeding US$ 10,000,000 with first class underwriters and will if requested include Owners as a co-insured beneficiary under their policy for such transit at no cost to Owners. In the event of an incident leading to capture of the vessel, Owners agree to use such underwriter's nominated response consultants and to notify same immediately using the following contact details:

Security Exchange Ltd., The Barn, Goring Heath, Reading RG8 7RH, UK:
Tel: UK office: +44 (0) 1491 683710 AOH: +44 20 3284 8844 Email: enquiries(at)securityexchange24.com

c. Owners will contract with their war risk insurers, the Hellenic Mutual War Risk Association for additional war risk premium (AWRP) on vessel's total value for each transit of the HRA and advise the expected gross and nett cost to Charterers.

Such premium to be re-imbursed by Charterers on presentation of usual supporting documentation evidencing premiums charged.
Charterers to have the benefit of any discounts or no-claims bonus enjoyed by Owners.

d. Insurance warranties - Owners guarantee that the vessel will be BMP4 compliant throughout the HRA transit with full razor wire protection, the Captain and crew must be fully briefed and must adhere to an increased watch throughout duration of the transit, minimum freeboard of 4 metres fully loaded, minimum calm water speed of 12 knots, registry with MSCHOA prior to entering the HRA and reporting to UKMTO as per UKMTO standard procedure.

### Clause 37 :

The Charter period from delivery to redelivery is to be calculated by reference to GMT at both ends. Laycan to be based on Local Time.

## Clause 38 :

The Vessel's holds on arrival at first load port shall be clean swept, washed, dried, free of loose rust scale/flake and previous cargo residue and be ready in all respects to receive Charterers' intended cargo. If the Vessel fails in hold inspection at loading port, the Vessel shall be off-hired from the time of failing inspection until such time all holds are accepted by the inspectors, and all cleaning expenses incurred thereby shall be for Owners' account.

## Clause 39 :

Should the vessel put back during a voyage due to an accident or breakdown of, or damage to, Hull Machinery or equipment, grounding, detention, accident to ship or cargo, or in the event of loss of time either in port or at sea, deviation upon the course of the voyage caused by sickness of or accident to the crew or any person on board the vessel (other than persons or supercargo traveling on request of the Charterers) or by reason of the refusal of the Master or crew to perform their duties, or by any other similar cause preventing the full working of the vessel, the payment of hire shall cease for any time thereby lost.
Should the vessel deviate for any other reasons than unless for the purpose of saving life at sea, or other than when acting as per the orders or directions of the Charterers, the vessel shall go on off hire from the time of her deviating or putting back until she is again in the same or equidistant position from the destination and the voyage resumed therefrom.

Consumption of bunkers during any and all off-hire periods are to be for Owners' account. If the vessel is off-hire for more than 90 (ninety) consecutive days, Charterers have the right to cancel the balance period of this Charter.

## Clause 40 :

If elected by Owners, Charterers' Agent at loading ports of call to handle customary husbanding matters at Owners' costs. At discharge port Owners to appoint and pay for their own Agent.

Charterers have the right to withhold from charter-hire during the period of this charter such amounts due to them for undisputed off-hire and Owners' disbursements, but with proper supporting statements to be sent to Owners promptly. Charterers have the right to withhold from charter hire Owners' estimated advances and disbursements but maximum of US$ 2,000 per port.

## Clause 41 :

Charterers to have the benefit of any return insurance premium received by Owners from Underwriters (as and when received from Underwriters) by reason of the vessel being in port for a minimum period of 30 days, provided vessel is on hire.
Charterers to have the benefit of Owners P and I Association as far as its rules permit.

Owners guarantee vessel is fully covered by P & I Club belonging to the International Group on terms and conditions in accordance with the standard rules of the P & I Club and that the original or certified copy of the certificate of entry is always kept on board.

Owners' P & I Club:

## Clause 42 :

Should any damage be caused to the vessel and/or her fitting by stevedores, Master has to try to let stevedores repair the damage, always within class requirements. If the damage cannot be repaired by stevedores, Master will notify the stevedores in writing and try to obtain written acknowledgement of the damage and liability from stevedores. Master to notify Charterers or their Agents of such stevedore damage within 24 hours from time of occurrence, except for hidden damages which to be reported latest on completion discharge, otherwise Charterers not responsible for the damage so caused.
Charterers to have privilege of redelivery without repairing the stevedore damage, for which Charterers are responsible, incurred during the currency of this Charter as long as such damage does not affect vessel's seaworthiness, cargo worthiness or vessel's trading capability provided Charterers undertake to reimburse the repair cost against the presentation of repair bills by the Owners unless otherwise agreed.

Charterers shall be permitted to have a representative in attendance during such repairs.

Charterers to redeliver the vessel with damages repaired at their time and cost insofar as, such damages affect the vessel's seaworthiness, cargo worthiness or vessel's trading capability.

## Clause 43 - BIMCO Standard ISM Clause :

From the date of coming into force of the International Safety Management (ISM) Code in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by failure on the part of the Owners or "the Company" to comply with the ISM Code shall be for the Owners' account.

## Clause 44 :

Charterers have the liberty to fumigate the cargo for their account, risk and expense on board the vessel either during loading, or after completion of loading or before or during discharge. Master/Owners not to clause Bills of Lading by reason of such fumigation.

Crew to stay on board during fumigation provided local/health regulation/vessel's P & I Club permit, alternatively, if crew refuse to stay on board although local/health regulation permit, Owners to pay crew accommodation and expenses ashore and time lost due to this to be for Owners' account, if local/health/ regulations/P & I Club do not permit stay on board then all such expenses to be for Charterers' account. Also Owners/Master certify that the vessel is in all respects capable and agreeable to "in transit fumigation" with aluminium phosphine/fostoxin or other approved product. Master to be fully advised of fumigation method employed and to confirm understanding of all safety precautions. However any protection material (masks, etc), if so required, to be at Charterers' costs and risk.

## Clause 45 :

Charterers and/or their Agents are hereby authorized to sign on Master's behalf Bills of Lading and Waybills (See Clause 114) as presented in accordance with Mate's receipts without prejudice to this Charter Party but Charterers to be responsible for all consequences that might result from Charterers and/or their Agents signing Bills of Lading and Waybills not adhering to the remarks in the Mate's Receipt. No through Bills of Lading allowed under this Charter Party.

## Clause 46 - Hire :

US$ 11,000 (Eleven Thousand U.S. Dollars) daily including overtime, payable every 15 days in advance. First hire installment plus the value of the bunkers on board on delivery to be paid within 3 banking days after delivery (as defined in Clause 50).

## Clause 47 - BIMCO/LMAA Arbitration Clause :

(a) This Contract shall be governed by and construed in accordance with English law and any dispute arising out of or in connection with this Contract shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause.

The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceedings are commenced.

The reference shall be to three arbitrators. A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within 14 calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and gives notice that it has done so within the 14 days specified. If the other party does not appoint its own arbitrator and give notice that it has done so within the 14 days specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall

advise the other party accordingly. The award of a sole arbitrator shall be binding on both parties as if he had been appointed by agreement.

Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.

In cases where neither the claim nor any counterclaim exceeds the sum of USD 50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

(b) Notwithstanding the above, the parties may agree at any time to refer to mediation any difference and/or dispute arising out of or in connection with this Contract.

In the case of a dispute in respect of which arbitration has been commenced under the above, the following shall apply:-

(i) Either party may at any time and from time to time elect to refer the dispute or part of the dispute to mediation by service on the other party of a written notice (the "Mediation Notice") calling on the other party to agree to mediation.

(ii) The other party shall thereupon within 14 calendar days of receipt of the Mediation Notice confirm that they agree to mediation, in which case the parties shall thereafter agree a mediator within a further 14 calendar days, failing which on the application of either party a mediator will be appointed promptly by the Arbitration Tribunal ("the Tribunal") or such person as the Tribunal may designate for that purpose. The mediation shall be conducted in such place and in accordance with such procedure and on such terms as the parties may agree or, in the event of disagreement, as may be set by the mediator.

(iii) If the other party does not agree to mediate, that fact may be brought to the attention of the Tribunal and may be taken into account by the Tribunal when allocating the costs of the arbitration as between the parties.

(iv) The mediation shall not affect the right of either party to seek such relief or take such steps as it considers necessary to protect its interest.

(v) Either party may advise the Tribunal that they have agreed to mediation. The arbitration procedure shall continue during the conduct of the mediation but the Tribunal may take the mediation timetable into account when setting the timetable for steps in the arbitration.

(vi) Unless otherwise agreed or specified in the mediation terms, each party shall bear its own costs incurred in the mediation and the parties shall share equally the mediator's costs and expenses.

(vii) The mediation process shall be without prejudice and confidential and no information or documents disclosed during it shall be revealed to the Tribunal except to the extent that they are disclosable under the law and procedure governing the arbitration.

## Clause 48 - Protective Clauses :

New Jason Clause, New Both-to-Blame Collision Clause, Conwartime 2004, General Clause Paramount, BIMCO Ice Clause paragraph B, C, D and P & I Bunker Clause to apply. All Bills of Lading and Waybills issued during the currency of the Charter Party are to incorporate the Hague or Hague-Visby Rules. All Bills of Lading issued under this Charter Party shall validly and effectively incorporate all the above.

## Clause 49 :

Bunkers on delivery about 1,100 metric tons HSIFO, about 340 metric tons LSIFO, about 60 metric tons MDO and about 20 metric tons LS MGO.
Bunkers on redelivery about same as actually on delivery.
Bunker prices same both ends US$ 620/700/950/1,000 per metric ton respectively.

Owners' option to bunker for their own account prior to redelivery provided same doesn't interfere with Charterers' operations and/or cargo lift.

Charterers to pay value of bunkers on delivery with first 15 days' hire payment and Charterers' to have the option to deduct value of bunkers on redelivery from last sufficient hire payments.

## Clause 50 :

Hire and all monies due to the Owners under this Charter Party will be paid to Onwers' bank account. No assignment of hire is permitted except with Charterers' consent except when this assignment is in favour of the lending bank.

Hire to be remitted to :

BENEFICIARY: MAXEIKOSIENA SHIPPING CORPORATION
COMMONWEALTH BANK OF AUSTRALIA, LONDON (SWIFT: CTBAGB2L)
ACCOUNT NO. 085036-USD-2408-01
IBAN: GB30CTBA60953808503601
CORRESPONDENT BANK: BANK OF NEW YORK MELLON, NEW YORK (SWIFT: IRVTUS3N)

With reference to Clause 5 hereof,
Where there is failure to make "punctual and regular payment" of hire including first hire payment, due to oversight, negligence, errors or omissions on the part of the Charterers, their bankers or respectively their Agents or otherwise for any reason whatsoever where there is absence of intention to fail to make timely payment, the Charterers shall be given by the Owners 3 (three) banking days written notice to rectify the failure and when so rectified the payment shall stand as punctual and regular.

## Clause 51 :

Time charter hire to include overtime and Charterers are not liable to pay any additional charges for nautical matters such as:

a) Opening and closing of hatches.
b) Shifting operations, docking, bunkering
c) Deleted
d) Supervision of loading and discharging
e) Preparing of hatches as much as possible prior to arrival at ports and commencement of operations.

## Clause 52 :

Owners confirm and warrant that they have not knowingly loaded Iranian or Iranian blended bunkers from any port that remain on the vessel at time of delivery that would be in breach of EU regulation 267/2012 in particular but not confined to Article 11 and Annex IV.
Charterers confirm and warrant that they will not knowingly bunker any Iranian or Iranian blended bunkers from any port onto the vessel after delivery that would be in breach of EU regulation 267/2012 in particular but not confined to Article 11 and Annex IV.

## Clause 53 :

The Charterers shall have the option of holding an inspection of the vessel, its certificates and/or class records at any time of this Charter. The Owners and Master shall give every facility and assistance, which shall not be unreasonably withheld.

Time and cost of survey to be for Charterers' account but the Master to give every facility to the Charterers and their Surveyors to carry out such tests.

The Charterers shall have the option to send their superintended at discharging port to assist communication between crew and Agent, to supervise the discharging operation. The Master and crew to render their cooperation to Charterers' superintendent and provide accommodation/meals if needed.

## Clause 54 - Description :

OWNRS: MAXEIKOSIENA SHIPPING CORPORATION, OF LIBERIA

MANAGERS/CONTACT: SAFETY MANAGEMENT OVERSEAS S.A ATHENS
PHONE: +30 210 895 70 70
FAX: +30 210 895 69 00
E-MAIL: OPERATIONS@SAFETY.GR - OPERATIONS
FIXING@SAFETY.GR - CHARTERING

BROKERS: ACROPOLIS CHARTERING AND SHIPPING INC
16, SKOYZE STR - PIRAEUS 185 36 GREECE
TEL: +30 210 4288068
FAX:210 4288072
E-MAIL: ACRO@OTENET.GR

M/V PEDHOULAS FARMER
CYPRUS FLAG GEARLESS, SELF TRIMMING, SD BULK CARRIER
BUILT ZHEJIANG OUHUA SHIPBUILDING CO., LTD 2012
16 MOORING DRUMS CO2 FITTED IN CARGO HOLDS
VESSEL EQUIPPED WITH SPECIAL DIRTY WATER HOLDING TANK 390 C.M.
(ESSENTIAL FOR LOADING AT EUROPEAN PORTS, AFTER CARGO HOLDS WASHING OF PREVIOUS CARGO)
81,600 MTONS DWAT ON 14.50 M SSW TPC 71.7
LOA 229 M BEAM 32.26 M
7/7 HO/HA WITH 3,390,000 CUBIC FEET GRAIN CAPACITY IN MAIN HOLDS
HATCH DIMENSIONS: NO.1 14.62 X 12.80M NO.2-7 15.48 X 15.00M

SPEED/CONSUMPTION: BASIS GOOD WEATHER CONDITIONS (WIND NOT EXCEEDING BEAUFORT SCALE 4, SEA CONDITION UP TO SEA STATE 3 ON THE DOUGLAS SCALE, AND NO NEGATIVE INFLUENCE OF SWELL / CURRENTS)

BALLAST: ABOUT 11,5 KNOTS ON ABOUT 17,5 MTONS HFO 380CST + 2 MTONS HFO 380CST FOR AUXS
LADEN: ABOUT 11,5 KNOTS ON ABOUT 22 MTONS HFO 380CST + 2 MTONS HFO 380CST FOR AUXS
PORT CONSUMPTION: ABOUT 2 MTONS MDO PER DAY + 0,8MTONS HFO FOR BOILER

BUNKERS SPECIFICATIONS :
AT ALL TIMES CHARTERERS TO SUPPLY HFO 380CST WHICH TO BE AT LEAST IN ACCORDANCE WITH ISO 8217 : 2010 RMG 380
MDO ACCORDING TO ISO 8217 2010 DMB
IF NOT AVAIL THE 2005 TO APPLY
MARPOL ANNEX VI TO APPLY

VESSEL BURNS MDO FOR M/E WHEN MANOUVERING / NAVIGATING IN / OUT PORTS AND IN NARROW / SHALLOW WATERS, RIVERS, CANALS ETC ETC, AND HFO FOR BALLAST WATER EXCHANGE.

CONSTANTS ABOUT 650 MT EXCL FW

ALL DETAILS ABT

CONTACT DETAILS:
TEL: +87773234229 / +87773234228
FAX: +87783207549
E-MAIL: PED.FARMER@GTSHIPS.COM

## Clause 55 :

All liabilities of the cargo claims to be settled on the basis of International P & I Club Agreement of the New York Produce Exchange, form dated February 20th, 1970 and reprinted May 1972 as amended 1984 and any further amendments thereto.

## Clause 56 - Crew War Risk Bonus :

Any crew war bonus paid and additional war risk insurance reasonably incurred due to vessel's trading to be for Charterers' account.

Owners to pay basic war risk insurance and any extra war risk insurance premium required by Owners' underwriters to be for Charterers' account.

Conwartime 2004 War Risk Clause to apply throughout this Charter Party.

## Clause 57 :

Deleted.

## Clause 58 - Bunker Fuel Sulphur Content Clause for Time Charter Parties 2005 :

(a) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone.

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-clause (a).

(b) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that:

(i) the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and
(ii) the Vessel shall be able to consume fuels of the required sulphur content when ordered by the Charterers to trade within any such zone.

Subject to having supplied the Vessel with fuels in accordance with Sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel's failure to comply with Regulations 14 and 18 of MARPOL Annex VI.

(c) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

## Clause 59 :

The Charterers shall have the liberty to order the laying up thereof at a safe berth, or safe port or safe anchorage, for any period of this Charter. If so requested by the Charterers, the Owners shall estimate the savings taking into account reductions in insurance and manning costs as well as extra costs for decommissioning and recommissioning. If the vessel is laid up, the Charter hire shall be reduced by the estimated savings as given by the Owners prior to lay-up for such laying up period. The place/port of lay-up will always be safe for the vessel/crew. It is clearly understood that the manning and any other matter related to the vessel's/crew safety shall remain at Owners' discretion.

## Clause 60 :

Any taxes levied by any government other than that of Owners' domicile or ship's flag in respect of the earnings of the vessel whilst under this Time-Charter shall be for Charterers' account.

## Clause 61 :

At all times Charterers to supply HFO 380CST which to be at least in accordance with ISO 8217 : 2010 RMG 380.
MDO according to ISO 8217 : 2010 DMB.
If not available, the 2005 specification to apply.

A) At the time of delivery of the vessel the Owners shall place at the disposal of the Charterers the bunker delivery note(s) and samples of the bunkers supplied on delivery which shall be taken at the vessel's bunker manifold and sealed in the presence of Charterers.

B) During the currency of the Charter the Charterers shall ensure that bunker delivery notes are presented to the vessel on delivery of fuel(s) and that during bunkering representative samples of the fuel(s) supplied shall be taken at the vessel's bunker manifold and sealed in the presence of competent representatives of the Charterers and the vessel.

C) Fuel samples shall be retained by the vessel for 90 (ninety) days after the date of delivery or for whatever period necessary in the case of a prior dispute and any dispute as to whether the bunker fuels confirm to the agreed specification(s) shall be settled by analysis of the sample(s) by mutually agreed fuels analyst whose findings shall be conclusive evidence as to conformity or otherwise with the bunker fuels specification(s).

D) The Owners reserve their right to make a claim against the Charterers for any damage to the main engines or the auxiliaries caused by the use of unsuitable fuels or fuels not complying with the agreed specification(s).

Additionally, if bunker fuels supplied do not conform with the mutually agreed specification(s) or otherwise prove unsuitable for burning in the ship's engines or auxiliaries the Owners shall not be held responsible for any reduction in the vessel's speed performance and/or increased bunker consumpiton or for any time lost and any other consequences.

Charterers to always supply bunkers as per specifications agreed in this Charter Party.

## Clause 62 :

Owners guarantee that vessel has clear holds and is suitable for grab discharge without extra expense.

## Clause 63 :

Either party to have the opportunity of cancelling this Charter or any remaining portion thereof if war breaks out between any two of the following countries directly affecting this Charter Party: United Kingdom, France, Germany, China, United States of America, Japan, Australia, Canada.

## Clause 64 :

The Charterers to pay to the Owners for all radiograms, telephone calls, telexes for the Charterers' business and all entertainment expenses including victualling for the Charterers' account at US$ 1,500 lumpsum per 30 days, pro rata.

## Clause 65 :

No deck cargo.

## Clause 66 :

Vessel is suitable for bulldozers discharge subject to tank top strength.

## Clause 67 :

Owners to arrange at their expense that Master, Officers and crew of vessel hold valid vaccination certificates or other necessary health certificates, if required, during this Charter.

## Clause 68 :

Watchmen for gangway from crew to be for Owners' account, but for cargo to be for Charterers' account. Watchmen required or compulsory watchmen to be for Charterers' account.
 In case of calling U.S. ports, any compulsory extra watchmen required due to crew nationality or any expense required to obtain crew visa, including extra compulsory watchmen if required by local custom/ port regulations, to be for Owner's account.

## Clause 69 :

It is understood that only boatage for Owners' business as well as vessel's Officers/crew used as conveyance to be for Owners' account, all other boatage to be for Charterers' account.

## Clause 70 :

Owner represents and guarantees that Owners and its vessel are not in any way directly or indirectly owned, controlled by or related to any Cuban, North Korean or Iraqi interests. Owner represents and guarantees that the vessel has not called at a Cuban port within 180 days of the vessel's estimated arrival at a U.S. port.

## Clause 71 :

The Owners shall provide and pay for insurance on the Vessel fully covering P & I risks and standard oil pollution cover up to the level customarily offered by the International Group of P & I Clubs, Hull & Machinery and War Risks.

## Clause 72 - Cargo Exclusions :

All cargoes carried under this Charter Party are in bulk/harmless.

The vessel shall be employed in carrying lawful merchandise excluding any goods of a dangerous, injurious, flammable or corrosive nature. Without prejudice to the generality of the foregoing, in addition the following are specifically excluded:

Livestock of any description, arms, ammunition, explosives (black powder, blasting caps, loaded bombs, detonators, dynamite, TNT), nuclear and radioactive materials and its waste, tar in bulk, blocks, hot briquetted iron, petroleum and its by-products, pitch in bulk, borax in bulk, bitumen, quebracho, sodium sulphate, calcium hydrochloride, bonemeal, charcoal, limestone, turpentine, ferro silicon, resin, cotton, nitrate, lime, Chilean nitrate, copra, pond coal, pebbles, brown coal, Indian coal (well understood that it means coal loaded in India), sponge iron, asphalt, sunflower seed expellers, ammonium nitrate, naphtha and its products, cement, cement clinker, direct reduced iron, direct reduced iron products, direct reduced iron ore pellets, steels, steel products, sulphur, salt/rock salt, nickel ore, asbestos, fishmeal, wet hides, creosoted goods, calcium carbide, motor spirits, industrial waste, acids, logs, lumber, all kinds of concentrates, all kinds of nitrates and sulphates, slags, granite, gypsum, soda ash, scrap including motor blocks and turnings, all kinds of expellers, oilcakes, seedcakes. Any and all cargoes belonging to Appendix "B" of BC Code. One (1) cargo of petcoke and two (2) of pig iron allowed during the currency of this Charter Party, with Owners' protective clauses to apply.

Iron ore concentrates allowed.

Soya beans, soya bean meal, soya bean meal pellets allowed provided they are loaded in accordance with IMO regulations.

Fertilizers to Australia not allowed under this Charter Party.

Dap and mop allowed.

Petcoke not to be loaded as last cargo under this Charter Party.
Petcoke/pig iron protective clause as per Charter Party.

Protective Clause for loading petcoke :

Petcoke loading
(a) The petroleum coke mentioned herein is only limited to petroleum coke of harmless/non-oily/non-hazardous/non-dangerous green delayed type.

(b) Charterers undertake to use holds as less as possible, provided vessel's stability trim and stress permitting.

(c) Such cargo to be loaded/stowed/trimmed/discharged strictly according to latest IMO and/or any other latest regulations/rules applicable to such cargo.

(d) Temperature of the cargo at the time of loading not to exceed 55 degrees Celsius.

(e) Should any additional/special wash down of holds before loading be recommended/proposed/required by Master, Charterers undertake to arrange the same at their expense/time.

(f) Charterers to arrange and remain responsible for cleaning holds after discharge to Master's satisfaction including chemical cleaning if necessary, all costs, time and expenses to be for Charterers' account.

(g) In case the vessel is not equipped with high pressure hoses, Charterers are to provide same so that vessel's holds can be thoroughly cleaned after discharge petcoke.

(h) If vessel should fail subsequent survey all time and expenses involved in passing survey to be for Charterers' account.

(i) Charterers are allowed to use ship's crew to perform cleaning following the carriage of petcoke, against paying US$ 700 per hold in addition to the normal intermediate hold cleaning allowance, but always subject to prior consent of Master/crew and local regulations permitting, and all time used to be for Charterers' account. All necessary materials, tools and equipment required to be supplied by Charterers in accordance with Master's requirement. Owners/Master are not held responsible for passing hold cleanliness for loading next cargo and for any consequences whatsoever caused due to such arrangement.

(j) Petcoke not to be last cargo prior redelivery. Calcined petcoke always excluded.

No pig iron allowed from Ponta da Madeira.

Pig Iron :
If pig iron is loaded, Charterers to ensure that enough cargo is lowered into the vessel's holds and placed on tank tops so as to produce a sufficient bedding in order to protect vessel's tanktops and holds, to Master's satisfaction. Charterers to place sufficient pallets on tanktops to provide cushion for first layer. Charterers to be responsible for removal of any dunnage following discharge including associated costs. Understand pig iron from Ponta da Madeira is always excluded.

## Clause 73 - Split Bills of Lading Clause :

Charterers and/or Agents hereby authorized by Owners/Master to split Bills of Lading and issue ship delivery orders in negotiable and tranferable form against collection of full set of original Bills of Lading. Delivery orders to conform with all terms and conditions and exceptions of Bills of Lading and shall not prejudice Ship Owners' rights.

## Clause 74 :

Deleted.

## Clause 75 - USCG Compliance Clause :

Owners warrant that during the term of the Charter, the vessel shall be in full compliance with all U.S. Coast Guard Pollution and Safety Regulations as contained in, but not limited to, Titles 33 and 46 of the Code of Federal Regulations, as amended.
Any and all delay to the vessel resulting from such non-compliance shall not count as laytime or, if laytime has expired, as time on demurrage.
Also the Owners recognize that the flag state of the vessel is on the USCG Targeted List of Flag States. As the Owners are aware, this means that the vessel will be subject to a strict USCG inspection before being allowed to commence cargo operations in the U.S.
Any time lost as a result of the inspection or the inspection procedure will be for the Owners' account and, if any deficiencies are found and have to be corrected before the commencement of cargo operations, any time lost to be for Owners' account.


## Clause 76 - Separations :

Separations if any, to be for Charterers' time, risk and expense, unless they are required by Owners/ Master or by reason of vessel's stability and/or safe trim, in which case they are to be for Owners'/vessel's risk and expense and any time lost is not to count as laytime on demurrage, provided one cargo to be loaded.


## Clause 77 - Stability :

Vessel has on board an approved trim and stability manual in accordance with the requirement of Chapter VI SOLAS Regulations 1974 and IMCO document BCXIX/INV.4 (concerning "filled holds ends untrimmed").


## Clause 78 :

Owners warrant that the vessel has on board "The International Tonnage Certificate 1969" in full accordance with IMO requirements and the International Convention on Tonnage Measurement of Ships, 1969.


## Clause 79 - Double Banking Clause :

(a) The Charterers shall have the right, where and when it is customary and safe for vessels of similar size and type to do so, to order the Vessel to go, lie or remain alongside another barge or floating crane at such safe dock, wharf, anchorage or other place for loading/discharging of cargo and/or bunkering.

(b) The Charterers shall pay for and provide such assistance and equipment as may be required by Master to enable any of the operations mentioned in this clause safely to be completed and shall give the Owners such advance notice as they reasonably can of the details of any such operations.

(c) Without prejudice to the generality of the Charterers' rights under (a) and (b), it is expressly agreed that the Master shall have the right to refuse to allow the Vessel to perform as provided in (a) and (b) if in his opinion it is not safe so to do and if the weather/sea conditions deteriorates has the right at any time to order his vessel to sail if he considers it unsafe for his vessel to remain double banked. Master's action will not interrupt hire from running.

(d) The Owners shall be entitled to insure any deductible under the Vessel's hull policy and the Charterers shall reimburse the Owners any additional premium(s) required by the Vessel's Underwriters and/or the cost of insuring any deductible under the Vessel's hull policy.

(e) The Charterers shall further indemnify the Owners for any costs, damage and liabilities resulting from such operation. The Vessel shall remain on hire for any time lost including periods for repairs as a result of such operation.

## Clause 80 :

Vessel's Officers and crew to be manned and controlled in accordance with International Transport Workers Federation recommendations. In the event of the vessel being boycotted, delayed or rendered inoperative by strikes, labour stoppages, or by any other difficulties due to ownership, crew, or any other vessel under the same ownership, operation or control, all time lost is to be considered as off hire.

## Clause 81 :

Owners warrant that the vessel is in all respects eligible for trading to the ports, places or countries specified in this Charter Party and that at all necessary times the vessel and/or Owners shall have all valid, records documents required for such trade.

## Clause 82 :

Should original Bills of Lading not arrive at discharge ports in time, entire cargo to be released against Charterers' single Letter of Indemnity in Owners' P and I Club wording. Letter of Indemnity to be signed by Charterers only.

## Clause 83 - Small Cranes Clause :

Charterers shall have the option of placing small cranes on vessel's main deck to facilitate loading/ dischargin operations in Thailand and Taiwan. Weight of crane(s) are not to exceed vessel's deck strength. Charterers are to put adequate fendings/protections and dunnage underneath the cranes, so that the weight of the crane is uniformly spread on the deck to Master's satisfaction. It is explicitly agreed that no welding of these cranes or their accessories/equipment will take place on vessel's deck, coamings or hatch covers and no cutting to vessel's fittings and/or equipment is allowed to facilitate placement of such cranes on board.
Above method of discharge with small cranes places on board is always at Charterers' time, risk and expenses.

It is explicitly understood that no detachment/removal of hatch covers are allowed under this Clause.

## Clause 84 :

Deleted.

## Clause 85 :

Notwithstanding anything else contained in this Charter Party all costs or expenses arising out of, or related to security regulations or measures required by any U.S. authority shall be for the Charterers' account.

## Clause 86 :

Deleted.

## Clause 87 :

All Bills of Lading and Waybills issued under this Charter Party must contain the following clause :
Any dispute under this bill of lading including matters of general average shall be decided according to English law to the exclusive jurisdiction of the court of justice in England.
All terms and conditions, liberties and exceptions of charter party between Head Charterers and Owners including the law and arbitration clause are herewith incorporated.

## Clause 88 :

Owners not to be responsible for any decrease in speed/increase in consumption of the vessel whether permanent or temporary cause by Charterers if vessel stays more than 25 days idle in tropical/non tropical waters. In such a case cleaning to be done in Charterers' time and expense.

## Clause 89 - Bulk Carrier Safety Clause :

(a) The Charterers shall instruct the Terminal Operators or their representatives to co-operate with the Master in completing the IMO SHIP/SHORE SAFETY CHECKLIST and shall arrange all cargo operations strictly in accordance with the guidelines set out therein.

(b) In addition to the above and notwithstanding any provision in this Charter Party in respect of loading/ discharging rates, the Charterers shall instruct the Terminal Operators to load/discharge the Vessel in accordance with the loading/discharging plan, which shall be approved by the Master with due regard to the Vessel's draught, trim, stability, stress or any other factor which may affect the safety of the Vessel.

(c) At any time during cargo operations the Master may, if he deems it necessary for reasons of safety of the Vessel, instruct the Terminal Operators or their representatives to slow down or stop the loading or discharging.

(d) Compliance with the provisions of this Clause shall not affect the counting of laytime

## Clause 90 - BIMCO ISPS/MTSA Clause for Time Charter Parties 2005 :

a) (i) The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

(iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

(b) (i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all sub-charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".

(ii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

## Clause 91 - BIMCO U.S. Customs Advance Notification/AMS Clause

(a) If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

i) Have in place a SCAC (Standard Carrier Alpha Code);
ii) Have in place an ICB (International Carrier Bond);
iii) Provide the Owners with a timely confirmation of i) and ii) above; and
iv) Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

## Clause 92 :

Deleted.

## Clause 93 :

Deleted.

## Clause 94 :

For Colombia trading

1. Installation of mooring bits on deck is allowed under the following condition.

Time, risk and expenses for loading of such mooring bits, installation, removing, discharging, repairing and any work related to this installation, to be for Charterers' account. Charterers is fully responsible for any and all damages and consequence, and those expenses to be for Charterers' account. Charterers is responsible for recovering to its original condition after removing such mooring bits.

Supervising of class surveyor to be done from decision of the place of installation until confirmation of recovery status after removing. And such certificate of confirmation from class surveyor is required.

Painting of top side tank to be applied and recovered to original condition.

Charterers to inform us name of LR surveyor who will attend and instructions of the place and means of installation.

2. Charterers warrant to take all possible measures to prevent drugs to go or concealed on board the vessel. Non compliance with the provisions of this clause shall amount to breach of warranty for the

consequences of which Charterers shall be liable and shall hold the Owners/Master and crew of the vessel harmless and indemnified against all claims whatsoever which may and be made against them individually or jointly. Furthermore all time lost and all expenses incurred, including fines shall be for Charterers' account and vessel will remain on hire.

## Clause 95 - BIMCO Conwartime 2004 :

(a) For the purpose of this Clause, the words:

(i) "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

(ii) "War Risks" shall include any actual, threatened or reported:

war; act of war; civil war; hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy; acts of terrorists; acts of hostility or malicious damage; blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever); by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(b) The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(c) The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerent's right of search and/or confiscation.

(d) (i) The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their protection and Indemnity Risks), and the premiums and/or calls therefor shall be for their account.

(ii) If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then the actual premiums and/or calls paid shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(e) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(f) The Vessel shall have liberty:-

(i) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(ii) to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(iii) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national

laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(iv) to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(v) to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(g) If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(h) If in compliance with any of the provisions of sub-clauses (b) to (g) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

## Clause 96 - BIMCO Weather Routing Clause for Time Charter Parties :

(a) The Vessel shall, unless otherwise instructed by the Charterers, proceed by the customary route, but the Master may deviate from the route if he has reasonable grounds to believe that such a route will compromise the safe navigation of the Vessel.

(b) In the event the Charterers supply the Master with weather routing information, the Master shall follow the reporting procedures of and the advice given by the Weather Routing Company (WRC) except for reasons of safety, in which case this is to be clearly and promptly communicated both to Charterers and to the WRC.

## Clause 97 :

The Charterers may supply an independent weather bureau advice to the Master, During voyage specified by the Charterers. The Master at his sole discretion shall comply with the reporting procedure of the routing service selected by Charterers. Evidence of weather conditions shall be taken from the vessel's deck logs and Independent weather bureau reports. In the event of a consistent discrepancy between the deck logs and the Independent weather reports, the Independent weather bureau reports shall be taken as ruling. For the purpose of this Charter Party "good weather conditions" are to be taken as wind speed not exceeding Beaufort Scale 4, sea condition upto sea state 3 on the Douglas scale and no adverse current or influence of swell".

No hire to be deducted for alleged underperformance claim until it has been agreed by both parties amicably, reasonably. In the event of disagreement and if an amicable solution can not be found then, Charterers to deduct amount of unsettled underperformance claim from last sufficient hire payment(s) before redelivery.

In case of relet the last paragraph should read:
"No hire to be deducted for alleged underperformance claim until it has been agreed by both parties. In the event of disagreement and if an amicable solution cannot be found then matter to be referred to arbitration".

## Clause 98 :

Deleted.

## Clause 99 :

Charterers have the liberty to relet any counter parties for periods up to 6 months. For longer periods relet to be discussed later.

## Clause 100 :

Charterers have the option to add all off-hire period including drydocking, but such option to be declared 30 (thirty) days prior to the expiration of the Charter period.

## Clause 101 - Arrest, Requisition, Seizure :

a) Arrest Clause
Should the vessel be arrested during the currency of this Charter at the suit of any person having claim against the vessel, hire under this Charter shall not be payable during this arrest, unless vessel remain in Charterers' use, and any bunkers consumed and vessel's expenses incurred shall be for Owners' account, unless such arrest is due to the default of Charterers or their agents in which case any and all claims, liabilities, cost (including legal fees), fines and any and all direct related resulting from an arrest to be for Charterers' account and vessel to remain on hire.

b) Requisition Clause
Should the vessel be requisitioned by any government or governmental authority during the period of this Charter, she shall be off-hire during the period of such requisition. If the vessel is requisitioned for a continuous period exceeding 75 days, then Charterers to have the option of cancelling this Charter.

c) Seizure/Detention due to Ownership and/or Flag and/or Registry
Should the vessel be seized or detained or embargoed due to her flag, registry or ownership during the currency of this Charter, the vessel to be off-hire immediately from the time of her seizure or detention or embargo until the vessel returns to Charterers' disposal. Unless such detention or embargo or seizure is occasioned by any personal act or omission or default of the Charterers or their agents, in which case all claims, losses, damages, liabilities, costs to be for Charterers' account and vessel to remain on hire.

## Clause 102 :

Deleted.

## Clause 103 :

Deleted.

## Clause 104 :

Deleted.

## Clause 105 - Drug and Alcohol Clause :

The Owners undertake to the Charterers that it has guidelines on drug and alcohol abuse applicable to the vessel, Owners' Agents, subcontractors, servants and employees with the objective that non of the Owners' Agents, subcontractors, servants and employees will navigate a ship or operate its onboard equipment while impaired by drugs or alcohol and that none of the Owners' Agents, subcontractors, servants and employees will have the use or possession of or the opportunity to sell or distribute or transport illicit or non-prescribed drugs aboard the vessel. Further, the Charterers expects that the Owners exercise due diligence throughout the period of the Contract to ensure that such guidelines are complied with by the Owners' Agents, subcontractors, servants and employees.

## Clause 106 - Entire Contract :

This Charter Party hereto which form part of it constitutes the entire contract between the parties and each party acknowledges that in entering into this Charter Party it has not relied on any representation, understanding or agreement, oral or written, other than as expressly provided in this Charter Party and waives all rights and remedies which might otherwise be available to it in respect thereof, provided always, that nothing in the Charter Party shall limit or exclude any liability of a party for fraud.

## Clause 107 - Communications :

The English language will be used in notices, letters, telexes and all other means of communication between parties, in this Charter Party:

(a) Without prejudice to any other mode of service, notices shall be deemed to be properly given if sent by e-mail or facsimile to the intended recipient at its then current cable or facsimile address to the recipient in the Charter Party.

(b) Subject to this Clause, any party hereto by notice to the other may change its address from that set out to such other address as is specified in the notice.

(c) Notices given in accordance with this Clause shall be deemed to have been properly given to the addressee in the ordinary course of transmission if by any means other than by post or, if given by post, four days after the date of posting.

(d) Owners' address for purpose of service is:
Safety Management Overseas S.A.
32, Karamanli Avenue,
166 73, Voula, Athens, Greece
Tel: +30 211 1888 400 Fax: +30 211 1878 510 email: operations@safety.gr

## Clause 108 - Clause Paramount :

General Clause Paramount, U.S.A. Paramount, as attached hereto, are to be considered part of this time Charter Party and same are to be incorporated into any Bills of Lading and/or Waybills issued hereunder.

## Clause 109 - Slow Steam :

Charterers have the option to slow steam vessel at any time during the course of this Charter Party on the basis of speeds and consumption which to be advised, but always within a range of safe, operable and harmless to the engine.

## Clause 110 - Metric Tons :

Whenever tons are referred to in this Charter Party, same are understood to be metric tons unless otherwise stated.

## Clause 111 :

Master/Officer/crew are to strictly observe regulations, rules at discharging port terminal.

## Clause 112 - Cargo Temperatures :

The vessel will be required to carry on board appropriate instruments for measuring concentrations of methane, oxygen and carbon monoxide, the "ph" value of hold bilge water sample and cargo temperatures in the range of 0-100 degrees centigrade without requiring entry into cargo spaces.

## Clause 113 :

Deleted.

## Clause 114 - Sea Waybill Clause :

The Master shall sign Bills of Lading or Sea Waybills for cargo as presented in strict accordance with Mate's/Tally Clerk's receipts. However, Charterers may sign Bills of Lading or Sea Waybills on the Master's behalf with Owners' prior written authority, always in accordance with Mate's/Tally Clerk's receipts.

Charterers are permitted to use non negotiable general Sea Waybills for the purpose of this Charter, always provided the Consignee's name and address is entered on the Sea Waybill on issue and the Charterers' instructions is that the cargo is to be delivered to that named Consignee. The Sea Waybill to be BIMCO "Genwaybill" form incorporating The Hague Visby Rules and all the clauses of the Charter Party, including the Arbitration London/English Law Clause.

Charterers to use BIMCO "Genwaybill" issued by BIMCO subject to the CMI Uniform Rules for Sea Waybills with the following "Transfer of Control Clause" incorporated.

"It is hereby noted that the shipper has irrevocably transferred the right of control (of disposal) of the goods to the Consignee under Rule 6 (II) of the CMI Uniform Rules for Sea Waybills. The carrier will hold the goods to the order of the Consignee subject to any lien in favour of the carrier."

## Clause 115 :

Vessel is not black listed at Newcastle, New South Wales, Australia.

## Clause 116 :

This Charter Party and any addendum thereto shall be governed by and construed in accordance with English law.

## Clause 117 - Dry dock Clause :

Drydocking allowed only in case of emergency.

## Clause 118 :

Charterers will not require vessel to call at any port or place where radiation levels are above the level allowed by the World Health Organization and/or International Atomic Energy Agency.

## Clause 119 :

Charterers will not trade to any place/port where vessel will be in breach of any resolutions/directives/laws/regulations etc. issued by UN/US/EU/UK, flag or other applicable authority.

## Clause 120 - Cargo Safety Clause :

Unless the cargo is elsewhere excluded in this Charter Party, the vessel may load any lawful, properly certified, safe, cargo in compliance with applicable regulations of the International Maritime Solid Bulk Cargoes Code (IMSBC Code) IMO Code of Safe Practice for Solid Bulk Cargoes (BC Code) prior to January 2011 or any subsequent revisions thereof and applicable local regulations in effect at the time of loading.
In case of conflict between IMSBC Code and local regulations then the IMSBC Code to apply.

At Owner's/Master's request, Charterers/shippers to identify the cargo to be loaded and jointly with Owners (or their agents or P&I Club representative) take representative samples. Such sample(s) to be tested/analysed in a mutually acceptable, competent laboratory before the ship is called to berth to determine whether the cargo is safe to load. For cargoes that may be subject to liquefaction, this will include testing/analysis of the flow moisture point, the transportable moisture limit and the actual moisture content. The results of such testing/analysis to be binding on all parties.

At Owner's/Master's request, Charterers and/or shippers shall provide to the Master before loading, complete and valid certification for all cargo intended for loading, as per the foregoing. The certificate(s) will remain valid for such period as defined by the IMSBC Code or applicable local regulations, whichever is the shorter. The vessel shall have the right to refuse to commence loading if such certification is not provided or the validity of which has expired, before loading and time will continue to count (or the vessel shall remain on hire, as applicable).

Any time lost or cost incurred as a result of shippers'/Charterers' failure to comply with this clause will be for Charterers' account.

## New Both-To-Blame Collision Clause :

If the liability for any collision in which the vessel is involved while performing this Charter Party falls to be determined in accordance with the laws of the United States of America, the following clause shall apply:

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the Owners of the goods carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the Owners of the said goods, paid or payable by the other or non-carrying ship or her Owners to the Owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying ship or Carrier. The foregoing provisions shall also apply where the Owners, Operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact."

and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

## General Clause Paramount :

The Bills of Lading shall have effect subject to the provisions of any legislation incorporating the rules contained in the international convention for the unification of certain rules relating to Bills of Lading, dated Brussels, 25th August, 1924 (the Hague Rules) or those rules as amended by the protocol signed at Brussels, February 23rd 1968 (The Hague Visby Rules) and which is compulsory applicable, the Hague Rules as enacted in the country of the port of loading shall apply. When no such enactment is in force in the country of the port of loading, the Hague or Hague Visby Rules to apply and in the absence of any such legislation, the terms of the 1924 convention as amended by the 1986 Protocol shall apply.

## New Jason Clause :

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever whether due to negligence or not, for which, or for the consequence of which, the Carrier is not responsible, by statute, contract or otherwise, the goods, Shippers, Consignees, or Owners of the goods shall contribute with the Carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods. If a salving ship is owned or operated by the Carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the Carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, Shippers, Consignees or Owners of the goods to the Carrier before delivery".

and the Charterers shall procure that all Bills of Lading issued under this Contract shall contain the same clause.

## P. & I. Bunker Clause :

The Vessel shall have liberty as part of the contract voyage and at any stage thereof to proceed to any port or ports whatsoever whether such ports are on or off the direct and/or customary route or routes to the ports of loading or discharge named in this Charter Party and there take oil bunkers in any quantity in the discretion of Owners even to full capacity of fuel tanks, deep tanks and any other compartment in which oil can be carried whether such amount is or is not required for the chartered voyage.

## BIMCO Ice Clause for Time Chartering :

(a) Deleted.

(b) The Vessel shall not be required to enter or remain in any icebound port or area, nor any port or area where lights, lightships, markers or buoys have been or are about to be withdrawn by reason of ice, nor where on account of ice there is, in the Master's sole discretion, a risk that, in the ordinary course of events, the Vessel will not be able safely to enter and remain at the port or area or to depart after completion of loading or discharging. If, on account of ice, the Master in his sole discretion considers it unsafe to proceed to, enter or remain at the place of loading or discharging for fear of the Vessel being frozen in and/or damaged, he shall be at liberty to sail to the nearest ice-free and safe place and there await the Charterers' instructions.

(c) Any delay or deviation caused by or resulting from ice shall be for the Charterers' account and the Vessel shall remain on-hire.

(d) Any additional premiums and/or calls required by the Vessel's underwriters due to the Vessel entering or remaining in any icebound port or area, shall be for the Charterers' account.



# EMERALD 82

## MV PEDHOULAS FARMER

CYPRUS FLAG GEARLESS, SELF TRIMMING, SD BULK CARRIER
BUILT ZHEJIANG OUHUA SHIPBUILDING CO., LTD – SEPTEMBER 2012
CLASS LR + 100A1
**16 MOORING DRUMS – CO2 FITTED IN CARGO HOLDS**
**VESSEL EQUIPPED WITH SPECIAL DIRTY WATER HOLDING TANK 390 C.M.**
**(essential for loading at European ports, after cargo holds washing of previous cargo)**

**81,600  MTONS DWT ON 14.50 M SSW**
**LOA** 229 M **BEAM** 32.26 M
7/7 HO/HA WITH **3,390,000** CUBIC FEET GRAIN CAPACITY IN MAIN HOLDS

**HATCH DIMENSIONS:**    No.1    14.62 x 12.80M
    No.2-7  15.48 x 15.00M

**SPEED/CONSUMPTION:**    BASIS GOOD WEATHER CONDITIONS (WIND NOT EXCEEDING BEAUFORT SCALE 4, SEA CONDITION UP TO SEA STATE 3 ON THE DOUGLAS SCALE, AND NO NEGATIVE INFLUENCE OF SWELL / CURRENTS)

**BALLAST:**    ABOUT **11,5 KNOTS** ON ABOUT **17,5 MTONS** HFO 380CST + **2 MTONS** HFO 380CST FOR AUXS

**LADEN :**    ABOUT **11,5 KNOTS** ON ABOUT **23 MTONS** HFO 380CST + **2 MTONS** HFO 380CST FOR AUXS

**PORT CONSUMPTION:** ABOUT 2 MTONS MDO PER DAY + 0,8MTONS HFO FOR BOILER

**BUNKERS SPECIFICATIONS :**
AT ALL TIMES CHARTERERS TO SUPPLY HFO 380CST WHICH TO BE AT LEAST IN ACCORDANCE WITH ISO 8217 : 2010 RMG 380

*MDO ACCORDING TO ISO 8217 2010 DMB*

*MARPOL ANNEX VI TO APPLY*

*VESSEL BURNS MDO FOR M/E FOR MANOUVERING / NAVIGATING IN / OUT PORTS AND IN NARROW / SHALLOW WATERS, RIVERS, CANALS, CHEMICALS FOR SLOWSTEAMING AND HFO FOR BALLAST WATER EXCHANGE.*

*CONSTANTS ABOUT 650 MT EXCL FW*

*ALL DETAILS AND PERFORMANCE FIGURES ARE "ABOUT", GIVEN IN GOOD FAITH, WOG.*

> ----- Original Message -----
>
> From: pmx@clarksons.it
> To: "ITALBULK SRL" <chartering@italbulk.com>
> CC: "ITALBULK SRL" <operations@comfinanziaria.com>
> Subject: Re : Mv Pedhoulas Farmer / ADMIntermare - final recap dd
> 22.10.15
> Date: Thu, 22 Oct 2015 17:38:41 +0200
>
> Ale/Paolo
> cc Giuseppe
>
>
> Re : Mv Pedhoulas Farmer / ADMIntermare - final recap dd 22.10.15
>
>
>
> Pleased to confirm herewith having clean fixed with cp dd 22nd Oct 2015 as follows:
>
>
> 1.privacy:
> ==========
>
> All negotiations and  fixture to be kept strictly private and
> confidential.
>
> 2. vessel:
> =========
>
> Mv Pedhoulas Farmer
>
> description attached but delete 'wog' and 'given in good faith'
>
> pls add " or iso 2005 in chopt"
>
> vsl's contact dets
> tel: 00870 773234229 / 773234228
> fax: 00870 783207549

1

EXHIBIT
tabbies
B


> email: ped.farmer@gtships.com
>
> last 4 cargoes starting from the most recent are:
> coal / coal /canola / soya beans
>
> 3. owner/Manager
> ================
>
> SOCIETA' COMMERCIALE E FINANZIARIA SRL (S.C.F.)
> Address:
> VIA FILIPPO TURATI 26. ZIP CODE 20212 MILANO, ITALY Telephone / Fax:
> +39 0108987111
>
> VAT : IT 12945110158
> LEGAL ADDRESS: VIA FILIPPO TURATI 26, 20121 MILANO, ITALY
>
> 4. account
> ==========
>
> ADMIntermare, a division of
> ADM International Sàrl
> A One Business Center
> La Pièce 3
> CH-1180 Rolle • Switzerland
>
> 5. period
> =======
>
> For a tc trip loading  grain/grain products via usg trading always via
> sps sbs sas always afloat always wi inl and always in accordance with
> vssl cargo/trading exclusions as per btb cp
>
> Routing via Cape of Good Hope
>
> 6. laycan
> =========
>
> a) laydays/cancelling: 1201 hrs 24 Oct - 12:00 hrs 26 Oct 2015
>
> b) itinerary: ETA GIBRALTAR  24 Oct 2015 AM AGW WP
>

> 7. delivery
> ========
>
> dely passing Gibraltar westbound atdnshinc
>
> 8. redely
> =======
>
> on dlosp 1 sp spore / jpn rge atdnshinc pico chrtrs to give 15-10 days
> approx and 5-3-2-1 days def redely notice
>
> 9. hire
> =====
>
> usd 10,750 diot inclot per day or pro rata
>
> 1st hire and value of bunkers on dely to be paid within 3 banking days after delivery. '
>
> for each hirepayment owns to send an e-mail invoice in order for
> chrtrs chrtrs to arrange hirepayment/s in time
>
> plsd advise bank acct
>
> -BANK ACCT:
>
> BANK  INTESA SANPAOLO SPA
> GENOVA HEAD OFFICE
> 16121 - GENOVA (ITALY)
>
> ACCOUNT No:  1610/09357463
> IBAN    IT18A0306901400161009357463
> SWIFT: BCITITMM
>
> CORR. BANK:  THE BANK OF NEW YORK
> SWIFT: IRVTUS3N
>
> 10. holds on delivery
> ===============
>
> VESSEL LATEST ON ARRIVAL AT FIRST LOADING BERTH, VSLS HOLD(S) TO BE
> CLEAN, SWEPT, WASHED DOWN AND DRIED UP AND IN ALL RESPECTS READY TO

> RECEIVE CHRTRS CARGO UPTO THE SATISFACTION OF INDEPENDENT SURVEYOR,
> FAILING WHICH, VSL TO BE PLACED OFF-HIRE FROM TIME OF REJECTION UNTIL WHEN
SUCCESSFULLY REINSPECTED.
> SHOULD NOT ALL THE HOLDS PASS THE FIRST INSPECTION AND BEING SHIPPERS
> ABLE TO LOAD CLEAN HOLDS, VESSEL TO BE ON HIRE PRO RATA, TILL
> SUCCESSFULLY REINSPECTED ON ALL HOLDS, WHEN SHE WILL BE AGAIN FULLY ON HIRE.
>
> 11. ILHC
> ======
>
> usd 5000,- ilhc
>
> 12. CVE
> =======
>
> usd 1500,-  pmpr
>
> 13. contract law and arbitration forum
> =====================================
>
> the contract to be construed in accordance with english law.
> arbitration to be in london
>
> 14. BUNKERS
> ============
>
> BOD ABT 1700 MT HFO AND ABT 165 MT LSMGO
>
> PRICES ASF: USD 240 PMT FOR HFO
>        USD 500 PMT FOR LSMGO
>
> SAME QTTIES/PRICES TO APPLY AT BOTH ENDS
>
> owners to confirm bunker delivered to be suffiecient to safely reach
> Singapore after having loaded in USG and routed via Cape of Good Hope
> provided a maximum staying at loading of 15 days and always unforseen
> circumstaces excepted
>
> 15. L.O.I. CLAUSE
> ==============
>

> IF THE ORIGINAL B/L CAN NOT BE PRESENTED AT DISPT, OWRS/MSTR AGREE TO
> DISCHG/RELEASE THE ENTIRE CGO W/OUT PRESENTATION OF THE ORIGINAL BSL
> AGAINST CHTS LOI IN OWRS STANDARD PNI FORM SIGND BY CHTRS ONLY.
>
> 16. ANTI-BRIIBERY CLAUSE
> ===============
>
> "Owners/Master and Charterers warrant that they will comply with all
> applicable laws, rules, regulations, decrees and/or official
> government orders to anti-bribery and anti-money laundering, including
> the ones of their own jurisdiction and of the countries from and to
> which the cargo is shipped under this Charter, and any jurisdiction
> through or to which funds are transmitted in performance of either
> party's obligations under this Charter.".
>
> 17: commission
> =============
>
> address commission:  3.75 PCT TO CHRTRS brokerage commission:  1.25
> PCT BROKERAGE TO BE EQUALLY SPLITTED BETWEEN BVB + Clarkson Platou
> (Italia)
>
> Address commission and BVB's brokerage as above is deductible from HIRE payment.
> Clarkson Platou (Italia) to be paid by the owners.
>
> 18. charter party
> =================
>
> Otherwise as per attached executed cp with logical amendments and
> mainterms agreed
>
> End recap
>
>
> Trust above is correct
>
>
>
> Many thanks forthe fixture
>
>

5

>
> Brgds
>
> Paolo Bovenga     : dir +39 010 5540211 / mob +39 335 398673
>
> CLARKSONS PLATOU (ITALIA) S.R.L.
> ===============================
> Piazza R. Rossetti 3A - P.O. Box 1659 - 16129 Genova Cap.Soc. EUR
> 100.000 i.v - C.F. e reg. Impr. di Genova n. 08939210152 P.I. IT
> 03221880101 - R.E.A. di Genova n. 327130 - Societa' con unico socio
>
> www.clarksons.com
>
> This e-mail and any files transmitted with it are confidential and
> intended solely for the use of the individual to whom it is addressed.
> If you have received this email in error please send it back.
> Unauthorized publication, use, disclosure, forwarding, printing or
> copying of this email and its associated attachments is strictly prohibited.

FIRST ORIGINAL

# Time Charter

GOVERNMENT FORM
*Approved by the New York Produce Exchange*
November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd 1946



1 THIS CHARTER PARTY, made and concluded in *Geneva this 22nd* day of *August 19 2014*

2 Between *Messrs, MAXEIKOSIENA SHIPPING CORPORATION,, Liberia*

3 Owners of the good *Cyprus flag* Steamship/Motorship *"PEDHOULAS FARMER" (Description see Clause 54)* of....

4 of .... tons gross register, and .... tons net register, having engines of .... indicated horse power

5 and with hull, machinery and equipment in a thoroughly efficient state, and classed ....

6 at .... of about .... cubic feet bale capacity, and about .... tons of 2240 lbs.

7 deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity,

8 allowing a minimum of fifty tons) on a draft of .... feet .... inches on .... Summer freeboard, inclusive of permanent bunkers,

9 which are of the capacity of about .... tons of fuel, and capable of steaming, fully laden, under good weather

10 conditions about .... knots on a consumption of about .... tons of best Welsh coal best grade fuel oil best grade Diesel oil,

11 now *See attached description* ....

12 .... and *Messrs, CARGILL INTERNATIONAL S.A. as* Charterers of the City of *Geneva*

13 WITNESSETH, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

14 about *a time charter period of minimum 11 to maximum 14 months in Charterers' option or in Charterers' option declarable 3 working days after delivery, for a time charter period of about 12 to about 14 months in Charterers' option ("about" means 15 days more or less in Charterers' option), trading world wide, always via safe port(s), safe berth(s), safe anchorage(s), always afloat, always within INL, Charterers' option NAABSA in grain ports Brazil/Uruguay/Argentina only as per Clause 6.*

15 ............within below mentioned trading limits.

16 Charterers to have liberty to sublet the vessel - *See Clause 99* for all or any part of the time covered by this Charter, but Charterers remaining responsible for

17 the fulfilment of this Charter Party.

18 Vessel to be placed at the disposal of the Charterers, at *on dropping last outward sea pilot Tianjin, any time, day or night, Sundays, Holidays included*

19 ....................

20 in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as

21 the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5. Vessel's *holds on her arrival first loadport to be clean/swept and dry as required for intended cargo failing which vessel to be offhire until she can be approved by independent surveyor (see Clause 38)* on her delivery to be

22 ready to receive cargo with clean swept holds and *and vessel to be* tight, staunch, strong and in every way fitted for the service, *and so maintained by Owners throughout the period of this Charter Party* having water ballast, winches and

23 donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same

24 time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying *cargoes as per Clause 72 trading to be worldwide, always afloat, always within Institute Warranty Limits and always via safe berth(s), safe port(s), safe anchorage(s), vessel to trade always within ice free ports, not to force ice or follow ice breakers - BIMCO ICE Clause paragraph B, C, D to apply, as per Clause 36* lawful merchan-

25 dise, including petroleum or its products, in proper containers, excluding ........

26 (vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,

27 all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North

28 America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or

29 Mexico, and/or South America .......... and/or Europe

30 and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between

31 October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic;

32 ..............

33 ..............

34 ..............

35 as the Charterers or their Agents shall direct, on the following conditions:

36 1. That the Owners *whilst on hire* shall *throughout the period of this Charter Party* provide and pay for all provisions *including lubricating oil, fresh water (see Clause 32),* wages and consular shipping and discharging fees of the Crew; shall pay for the

37 insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep

38 the vessel in a thoroughly efficient state in hull, *cargo spaces,* machinery and equipment *with all certificates to comply with current regulations at all ports of call* for and during the service.

39 2. That the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, Pilotages, *(which under this Charter Party includes compulsory and recommended by IMO on Master's request i.e. Dardanelles, Bosphorus, full Skaw, full Magellan, Great Barrier Reef, Torres Straits, etc.)* Agencies, Commissions, *boatage on Charterers' business, agencies for clearance and cargo purposes only,* Commissions,

40 Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into

41 a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of

42 illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this

43 charter to be for Charterers account. All other fumigations to be for Charterers account after vessel has been on charter for a continuous period

44 of six months or more.

45 Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but

46 Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards

47 for dunnage, they making good any damage thereto.

48 3. *See Clause 49* That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on

49 board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than ........ tons and not more than .......

50 ....... tons and to be re-delivered with not less than ....... tons and not more than ....... tons.

51  4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of *See Clause 46*

52  ~~........in~~ United States Currency *commencing on and from the day of her delivery.* ~~per ton on vessel's total deadweight carrying capacity, including bunkers and~~

53  ~~stores, on .......... summer freeboard, per Calendar Month, commencing on and from the day of her delivery,~~ as aforesaid, and at

54  and after the same rate for any part of a *day* ~~month~~; hire to continue until the *time* ~~hour~~ of the day of her re-delivery in like good order and condition, ordinary

55  wear and tear excepted, to the Owners (unless lost) ~~at~~ *on dropping last outward sea pilot, one safe port in Charterers' option within the following ranges any time, day or night, Sundays, Holidays included: 1. Singapore/Japan range including South Korea/PRC/Taiwan/Philippine Islands/ Indonesia/Malaysia/Thailand/Vietnam 2. Skaw/Passero range including UK/Continent/Eire/Morocco or passing either westbound 3. PMO/Japan range including India*

56  ~~.......~~ unless otherwise mutually agreed. Charterers are to give Owners not less than ~~days~~ *30 days approximate*

57  ~~notice of vessels expected date of re-delivery~~ *notice of vessel's expected date of redelivery notice, followed by 20/15/5/3/2/1 days notice of vessel's expected date of redelivery* and probable port.

58  5. Payment of said hire to be made *See Clause 50* ~~in New York in cash~~ in United States Currency, *every 15 days* ~~semi-monthly~~ in advance, *less commission* and for the last *15 days* ~~half month~~ or

59  part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes

60  due, if so required by Owners, unless bank guarantee ~~or deposit~~ is made by the Charterers, otherwise failing the punctual and regular payment of the

61  hire, or bank guarantee, or on any breach of this Charter Party *(always in line with and subject to Clause 50)*, the Owners shall be at liberty to

62  withdraw the vessel from the service of the Char-
terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. ~~Time to count from 7 a.m. on the working day~~

63  ~~following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they~~

64  ~~to have the privilege of using vessel at once, such time used to count as hire.~~

65  Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject

66  to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application

67  of such advances.

68  6. That the cargo or cargoes be laden and/or discharged in any dock or at any wharf or place that Charterers or their Agents may

69  direct, provided the vessel can safely lie always afloat at any time of tide, ~~except at such places where it is customary for similar size vessels to safely~~

70  ~~lie aground.~~ *NAABSA to be applied in grain ports, Brazil/Uruguay/Argentina only.*

71  7. That the whole reach of the Vessel's Hold, ~~Decks,~~ and usual places of loading (not more than she can reasonably stow and carry), also

72  accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,

73  tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of using accommodations as far as accommodations allow, Charterers~~

74  ~~paying Owners ........ per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are~~

75  ~~incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense.~~

76  8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and

77  boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and

78  agency; and Charterers are to load, stow, ~~and~~ trim *and discharge* the cargo at their expense under the supervision of the Captain, who is to sign Bills of Lading *or Waybills (See Clause 114)* for

79  cargo as presented, in conformity with Mate's or Tally Clerk's receipts.

80  9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on

81  receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

82  10. That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted

83  with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, ~~Charterers paying at the~~

84  ~~rate of $1.00 per day.~~ Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally

85  Clerks, Stevedore's Foreman, etc., Charterers paying *See Clause 64* ~~at the current rate per meal, for all such victualling.~~

86  11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the

87  Captain shall keep a full and correct Log of the voyage or voyages, which are to be *made available* ~~patent~~ to the Charterers or their Agents, and furnish the Char-

88  terers, their Agents or Supercargo, when required, with a true copy of daily *deck and engine* Logs *in English on Charterers' forms*, showing the course of the vessel and distance run and the con-

89  sumption of fuel.

90  12. That the Captain shall use diligence in caring for the ventilation of the cargo.

91  13. ~~That the Charterers shall have the option of continuing this charter for a further period of .......~~

92  ~~..................................................................................................~~

93  ~~on giving written notice thereof to the Owners or their Agents ........ days previous to the expiration of the first-named term, or any declared option.~~

94  14. That if required by Charterers, time not to commence before *01st September 2014, 00:01 hours* and should vessel

95  not have *been delivered* ~~given written notice of readiness~~ on or before *10th September 2014, 24:00 hours - Vessel ready about 31st August ex grains discharge* ~~but not later than 4 p.m.~~ Charterers or

96  their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness. *Owners to give approximately 5/3/2/1 days notice of delivery to Charterers.*

97  15. That in the event of the loss of time from *default and/or* deficiency of men *including strike of officers and/or ratings or deficiency* or stores, fire, breakdown or damages to hull, machinery or equipment,

98  grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, *on account of vessel's non-compliance with government and/or state and/or provincial regulations pertaining to water pollution,* or by any other cause

99  preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by

100  defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence

101  thereof, and all ~~extra~~ *vessel's* expenses shall be deducted from the hire.

102  16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be

103  returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,

104  Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

105  The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the

106  purpose of saving life and property.

107  17. *See Clause 47* ~~That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at New York,~~

108  ~~one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for~~

109  ~~the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men.~~

110 18. That the Owners shall have a lien upon all cargoes, and all sub-freights, *sub-hires or bunkers* for any amounts due under this Charter, including General Aver-

111 age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess

112 deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which

113 might have priority over the title and interest of the owners in the vessel.

114 19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and

115 Crew's proportion. General Average shall be adjusted, stated and settled, *in London. English Law to apply* according to ~~Rules 1 to 15, inclusive, 17 to~~

116 ~~22, inclusive, and Rule F of~~ York-Antwerp Rules *as amended 1990* ~~1924~~, *See New Jason Clause as attached.* ~~at such port or place in the United States as may be selected by the~~

117 ~~carrier, and as to matters not provided for by these~~ ~~Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into~~

118 ~~United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at~~

119 ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~

120 ~~bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier~~

121 ~~or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if~~

122 ~~required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the~~

123 ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the~~

124 ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~

125 ~~United States money.~~

126 ~~In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever,~~

127 ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~

128 ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~

129 ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~

130 ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~

131 ~~ships belonged to strangers.~~

132 Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.

133 20. Fuel used by the vessel while off hire *to be agreed to as to quantity, and the costs of replacing same, to be allowed by Owners. No deductions for domestic consumption.* ~~also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity, and the~~

134 ~~cost of replacing same, to be allowed by Owners.~~

135 21. *See Clause 88* ~~That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~

136 ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from~~

137 ~~time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~

138 ...............................

139 ...............................

140 22. ~~Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks) capable of handling lifts up to three tons, also~~

141 ~~providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for~~

142 ~~same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel lanterns and oil for~~

143 ~~night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense. The~~

144 ~~Charterers to have the use of any gear on board the vessel.~~

145 23. Vessel to work night and day, *weekends, holidays included* if required by Charterers, *vessel to provide electric light for night work as on board* ~~and all winches to be at Charterers' disposal during loading and discharging;~~

146 ~~steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen,~~

147 ~~deck-hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the~~

148 ~~port, or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or~~

149 ~~insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned~~

150 ~~thereby.~~

151 24. ~~It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained~~

152 ~~in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,~~

153 ~~etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both~~

154 ~~of which are to be included in all bills of lading issued hereunder:~~

155 ..........................U.S.A. Clause Paramount

156 ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April~~

157 ~~16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of~~

158 ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading~~

159 ~~be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~

160 ..........................Both to Blame Collision Clause

161 ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~

162 ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~

163 ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss~~

164 ~~or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-~~

165 ~~carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her~~

166 ~~owners as part of their claim against the carrying ship or carrier.~~

167 25. The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-

168 drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the

169 port or to get out after having completed loading or discharging. *Bimco Ice Clause (paragraphs: B, C, D) as attached to apply.*

170 26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the

171 navigation of the vessel, *acts of pilots, tugboats*, insurance, crew, and all other matters, same as when trading for their own account.

172 27. A commission of ~~2 1/2~~ *1.00* per cent is payable by the Vessel and Owners to *ACROPOLIS CHARTERING AND SHIPPING INC.,*

173 ...............................

174 on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

175 28. An address commission of ~~2 1/2~~ *3.75* per cent payable to *Charterers.......* on the hire earned and paid under this Charter.

# FIRST ORIGINAL

*Clause 28 to 120 appended herewith are deemed fully incorporated in this Charter Party.*

THE OWNERS:                                    THE CHARTERERS:

**By authority of the Owners
for and on behalf of,**

SAFETY MANAGEMENT OVERSEAS S.A.
32 Avenue Karamanli
PO BOX 70837 - 16605
Athens, Greece
Telephone (+30) 210 895 7070

**Safety Management Overseas S.A.**

CARGILL INTERNATIONAL SA
14 chemin De Normandie
Case postale 383
CH-1211 GENÈVE 12

"This Charter Party is a computer generated copy of the NYPE 46 form printed by authority of the Association of Ship Brokers & Agents (U.S.A.), Inc. (ASBA), using software which is the copyright of Chinsay AB ("Chinsay"). Any insertion or deletion to the form must be clearly visible. In the event that any modification is made to the preprinted text of this document, and is not clearly visible, the provisions of the original ASBA-approved document shall apply. ASBA and Chinsay assume no responsibility for any loss or damage caused as a result of discrepancies between the original ASBA-approved document and this document."



## ADDITIONAL CLAUSES

### Clause 28 :

Deleted.

### Clause 29 :

Deleted.

### Clause 30 - On/Off Hire Survey :

Charterers to appoint a Surveyor acting on their behalf for performing a joint on and off-hire bunker survey as well as a full condition survey. Joint on-hire bunker and condition survey to be in Owners' time and joint off-hire bunker and condition survey to be in Charterers' time. Expenses to be shared 50/50. Vessel will only be off-hire provided time is actually lost.

### Clause 31 :

Charterers' option to redeliver the vessel unclean against paying Owners' lumpsum of US$ 5,500 in lieu of hold cleaning.

### Clause 32 :

Crew to assist in cleaning holds between voyages where requested to do so at their best, but cleaning always subject to duration of ballast voyage and weather conditions. Owners not to be responsible for passing of subsequent holds surveys and vessel to remain on hire. It is understood such hold cleaning always provided shore regulations permitting and any materials/chemicals/fresh water used to be for Charterers' account.

Intermediate holds cleaning:
US$ 4,500 after non grains;
US$ 4,000 after grains;

### Clause 33 :

Owners shall arrange necessary International Certificates including but not limited to US Coast Guard Certificates enabling vessel to trade United States waters during the currency of the Charter Party period. Owners warrant to provide and maintain at their expenses and carry on board the vessel a valid US Federal Maritime Commission's Certificate of Financial Responsibility as required under the US Water Quality Act of 1970 and amendments thereto. In no case shall the Charterers be liable for any damages as a result of the Owners' failure to obtain the aforementioned certificates or the Owners' non-compliance with present Water Pollution Legislation enacted by individual US States. Owners warrant that they are covered for pollution liability insurance upto 1 billion US Dollars.

It is a condition of this Charter Party that the Officers and crew of the vessel are covered for the duration of this Charter Party by an International Transport Workers Federation Agreement acceptable world wide or other Bona Fide Trade Union Agreement conforming to International Transport Workers Federation standards. Time lost by non-compliance to be considered as off-hire. In the event that the vessel is delayed by reason of boycotts, strikes, labour stoppages or other actions by the International Transport Workers Federation against the vessel due to employment conditions, time so lost shall be considered as off-hire.

Owners to supply valid deratization exemption certificate on delivery of vessel. Renewal cost of the same to be for Owners' account and if any time lost or vessel detained on account of renewal vessel to be off-hire.
Fumigation ordered because of illness of the crew to be for Owners' account. If Charterers require sanitary inspection for radio pratique in addition to deratization exemption certificate, renewal costs of the same to be for Charterers' account.

### Clause 34 :

In the event of loss of time due to blockade or detention of the vessel in any port of place by shore labour or others (whether arising from Government restrictions or not) by reason of:

a) The terms and conditions on which the members of the crew are employed.
b) Any physical or documentary deficiency in relation to the vessel's safety.

Payment of hire shall cease for the time thereby lost.

### Clause 35 :

Any delay, vessel's expenses or fines incurred on account of smuggling, if caused by the Officers, crew or other persons employed by the Owners, to be for Owners' account, but if caused by Agents or staff or supercargo of Charterers' same to be for Charterers' time and expense.

### Clause 36 - Trading Exclusions :

Trading area to be worldwide within Institute Warranty Limits but excluding Israel, all Russian Pacific ports, Iran, Iraq, Cambodia (Kampuchea), Cuba, Salvador, Congo (Brazzaville), Amazon, Orinoco, Somalia, Yemen, Liberia, North Korea, Alaska, Turkey, Turkey occupied Cyprus, East Timor, Nigeria, trading Saint Lawrence/East Coast Canada between 01 December - 30 April, trading north of Kiel Canal including Baltic between 01 December - 30 April, Lebanon, Syria, Iceland, Hudson Bay, Libya, Albania, Servia, Montenegro, Haiti, Ghana, Zaire, Burma, Tanzania, Namibia, Nicaragua, El Salvador, Georgia, Ethiopia, Guatemala, Angola, Bangladesh, Ivory Coast, Kenya, direct trading between People Republic of China and Taiwan and vice versa. War or warlikes zones and any countries banned and/or boycotted by U.S.A. or U.N. or prohibited by vessel's flag. Vessel will not be required to call above San Lorenzo but including Quebracho/Terminal 6 and Timbues.

Murmansk/Narvik/Kirkeness allowed 1st April to 1st December only.

Trading lower Baltic i.e. Denmark/Germany/Poland upto Klaipeda allowed provided port/area is ice free/ not to force ice, not follow ice breakers, BIMCO Ice Clause for Time Chartering (attached in C/P) to apply. No breach of IWL allowed in this Charter Party.

Notwithstanding anything agreed in this clause it is clearly understood that vessel will always trade within IWL.

Spitzbergen always excluded from trade.

Iran always excluded from trade.

- Vessel allowed to trade Magellan / Cape Horn at summer months only, i.e. October to May inclusive.

Vessel not to be employed on consecutive short haul trades.

- Owners to permit the vessel to call at ports which has been declared at risk of Asian Gypsy Moth by USDA or Canadian or other authorities.

After vessel's discharge and prior to vessel's leaving such port or latest prior vessel's arrival at next load port, provided last port of call is not the redelivery port under the Charter Party, a company, approved by USDA/Canadian/Australian authorities or authorities of country of next calling port, will perform a necessary inspection to declare vessel is clear and free of Asian Gypsy Moth and will issue a certificate of cleanliness at Charterers' time, risk and expense.
Should any fumigation be necessary then all time and costs including costs associated to crew transportation/accommodation ashore to be for Charterers' account until the vessel fully passes inspection and vessel to remain on hire.
If vessel is not accepted by USDA/Canadian or any other relevant authority as a result of call at such port then all expenses involved to be for Charterers' account and vessel to remain on hire.

Trading Gulf of Aden allowed 3 times during the currency of this Charter Party.

Amended BIMCO 2009 Piracy Clause to read as follows:

(a) If the Owners consent or if the vessel proceeds to or through an area exposed to the risk of piracy the Owners shall have the liberty:

(i) to take reasonable preventative measures to protect the vessel, her crew and cargo including but not limited to re-routeing within the area, proceeding in convoy, using escorts, avoiding day or night navigation, adjusting speed or course, or engaging security personnel or equipment on or about the vessel.

(ii) to comply with the orders, directions or recommendations of any underwriters who have the authority to give the same under the terms of the insurance.

(iii) to comply with all orders, directions, recommendations or advice given by the government of the nation under whose flag the vessel sails, or other government to whose laws the Owners are subject, or any other government, body or group, including military authorities, whatsoever acting with the power to compel compliance with their orders or directions; and

(iv) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement.

and the Charterers shall indemnify the Owners for any claims from holders of Bills of Lading or third parties caused by the vessel proceeding as aforesaid, save to the extent that such claims are covered by additional insurance as provided in sub-clause (b)(iii).

(b) Costs

(i) If the vessel proceeds to or through an area where due to risk of piracy additional costs will be incurred including but not limited to additional personnel and preventative measures to avoid piracy, such reasonable costs shall be for the Charterers' account. Any time lost waiting for convoys, following recommended routeing, timing, or reducing speed or taking measures to minimise risk, shall be for the Charterers' account and the vessel shall remain on hire.

(ii) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers.

(iii) If the underwriters of the Owners' insurances require additional premiums or additional insurance cover is necessary because the vessel proceeds to or through an area exposed to risk of piracy, then such additional insurance costs shall be reimbursed by the Charterers to the Owners.

(iv) All payments arising under Sub-Clause (b) shall be settled within fifteen (15) days of receipt of Owners' supported invoices or on redelivery, whichever occurs first.

(c) If the vessel is attacked by pirates any time lost shall be for the account of the Charterers and the vessel shall remain on hire.

(d) If the vessel is seized by pirates the Owners shall keep the Charterers closely informed of the efforts made to have the vessel released. The vessel shall remain on hire throughout the seizure and the Charterers' obligations shall remain unaffected, except that hire payments shall cease as of the three hundred and sixty first (361st) day after the seizure and shall resume once the vessel is released. The Charterers shall not be liable for late redelivery under this Charter Party resulting from seizure of the vessel by pirates.

(e) If in compliance with this clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party. In the event of a conflict between the provisions of this clause and any implied or express provision of the Charter Party, this clause shall prevail to the extent of such conflict, but no further.

HIGH RISK AREA TRANSIT
Notwithstanding any other provisions in this Charter Party, it is hereby agreed that Owners will permit the vessel to transit the high risk area (HRA) of the Indian Ocean / Arabian sea / Gulf of Oman / Gulf of Aden (maximum 3 times during the currency of this Charter Party) as defined by the joint war committee of Lloyds market association from time to time subject to the following terms and conditions:

1. Security Guards

a. Owners will employ an armed security team on board the vessel at their risk and expense (subject to 1(g) below).

b. Owners will contract with an SSP (Security Services Provider) recommended and vetted by Charterers and accredited by vessel's flag authorities and chosen from one of the following:

(i) GOAGT (Gulf of Aden Group Transits Limited), (ii) PVI (Protection Vessels International) or (iii) Mast. Charterers confirm that all the foregoing SSP are either accredited by the security association for the Maritime Industry (SAMI) and/or approved by leading underwriters of both LOH and K+R insurances.

c. The basis of the contractual arrangement between Owners and the SSP will be the BIMCO "Guardcon" contract with logical amendments approved by vessel's P+I Club.

d. The on board security team will be embarked and disembarked at the closest convenient locations to the entry and exit point of the HRA as provided by the chosen Security Services Provider.

e. The vessel will take a reasonably direct route at Master's discretion through the HRA from the embarkation point of the security team to the disembarkation point.

f. The chosen SSP will also arrange for required hardening materials (including full razor wire protection) for the vessel, not already on board, in accordance with BMP4 (Best Management Practices V. 4) to be supplied to the vessel prior to or at the same time as the embarkation of the security team. Such hardening materials to be installed by the crew under the direction of and verified by the security team.

g. Costs of the SSP (including provision of hardening materials) will be re-imbursed by Charterers to Owners promptly on presentation of usual supporting documentation. Owners will provide Charterers with a copy of the contract with the SSP upon request.

2. Insurance

a. Charterers will contract for LOH (loss of hire) insurance (including blocking and trapping) for a period not exceeding 360 days at their expense and will if requested include Owners as a co-insured beneficiary under their policy for such transit at no cost to Owners.
The vessel also will remain on-hire in the event of capture by pirates for a maximum of 360 days.

b. Charterers will contract for K+R (kidnap+ransom) insurance for an aggregate amount not exceeding US$ 10,000,000 with first class underwriters and will if requested include Owners as a co-insured beneficiary under their policy for such transit at no cost to Owners. In the event of an incident leading to capture of the vessel, Owners agree to use such underwriter's nominated response consultants and to notify same immediately using the following contact details:

Security Exchange Ltd., The Barn, Goring Heath, Reading RG8 7RH, UK:
Tel: UK office: +44 (0) 1491 683710 AOH: +44 20 3284 8844 Email: enquiries(at)securityexchange24.com

c. Owners will contract with their war risk insurers, the Hellenic Mutual War Risk Association for additional war risk premium (AWRP) on vessel's total value for each transit of the HRA and advise the expected gross and nett cost to Charterers.

Such premium to be re-imbursed by Charterers on presentation of usual supporting documentation evidencing premiums charged.
Charterers to have the benefit of any discounts or no-claims bonus enjoyed by Owners.

d. Insurance warranties - Owners guarantee that the vessel will be BMP4 compliant throughout the HRA transit with full razor wire protection, the Captain and crew must be fully briefed and must adhere to an increased watch throughout duration of the transit, minimum freeboard of 4 metres fully loaded, minimum calm water speed of 12 knots, registry with MSCHOA prior to entering the HRA and reporting to UKMTO as per UKMTO standard procedure.

## Clause 37 :

The Charter period from delivery to redelivery is to be calculated by reference to GMT at both ends. Laycan to be based on Local Time.

## Clause 38 :

The Vessel's holds on arrival at first load port shall be clean swept, washed, dried, free of loose rust scale/flake and previous cargo residue and be ready in all respects to receive Charterers' intended cargo. If the Vessel fails in hold inspection at loading port, the Vessel shall be off-hired from the time of failing inspection until such time all holds are accepted by the inspectors, and all cleaning expenses incurred thereby shall be for Owners' account.

## Clause 39 :

Should the vessel put back during a voyage due to an accident or breakdown of, or damage to, Hull Machinery or equipment, grounding, detention, accident to ship or cargo, or in the event of loss of time either in port or at sea, deviation upon the course of the voyage caused by sickness of or accident to the crew or any person on board the vessel (other than persons or supercargo traveling on request of the Charterers) or by reason of the refusal of the Master or crew to perform their duties, or by any other similar cause preventing the full working of the vessel, the payment of hire shall cease for any time thereby lost.
Should the vessel deviate for any other reasons than unless for the purpose of saving life at sea, or other than when acting as per the orders or directions of the Charterers, the vessel shall go on off hire from the time of her deviating or putting back until she is again in the same or equidistant position from the destination and the voyage resumed therefrom.

Consumption of bunkers during any and all off-hire periods are to be for Owners' account. If the vessel is off-hire for more than 90 (ninety) consecutive days, Charterers have the right to cancel the balance period of this Charter.

## Clause 40 :

If elected by Owners, Charterers' Agent at loading ports of call to handle customary husbanding matters at Owners' costs. At discharge port Owners to appoint and pay for their own Agent.

Charterers have the right to withhold from charter-hire during the period of this charter such amounts due to them for undisputed off-hire and Owners' disbursements, but with proper supporting statements to be sent to Owners promptly. Charterers have the right to withhold from charter hire Owners' estimated advances and disbursements but maximum of US$ 2,000 per port.

## Clause 41 :

Charterers to have the benefit of any return insurance premium received by Owners from Underwriters (as and when received from Underwriters) by reason of the vessel being in port for a minimum period of 30 days, provided vessel is on hire.
Charterers to have the benefit of Owners P and I Association as far as its rules permit.

Owners guarantee vessel is fully covered by P & I Club belonging to the International Group on terms and conditions in accordance with the standard rules of the P & I Club and that the original or certified copy of the certificate of entry is always kept on board.

Owners' P & I Club:

## Clause 42 :

Should any damage be caused to the vessel and/or her fitting by stevedores, Master has to try to let stevedores repair the damage, always within class requirements. If the damage cannot be repaired by stevedores, Master will notify the stevedores in writing and try to obtain written acknowledgement of the damage and liability from stevedores. Master to notify Charterers or their Agents of such stevedore damage within 24 hours from time of occurrence, except for hidden damages which to be reported latest on completion discharge, otherwise Charterers not responsible for the damage so caused.
Charterers to have privilege of redelivery without repairing the stevedore damage, for which Charterers are responsible, incurred during the currency of this Charter as long as such damage does not affect vessel's seaworthiness, cargo worthiness or vessel's trading capability provided Charterers undertake to reimburse the repair cost against the presentation of repair bills by the Owners unless otherwise agreed.

Charterers shall be permitted to have a representative in attendance during such repairs.

Charterers to redeliver the vessel with damages repaired at their time and cost insofar as, such damages affect the vessel's seaworthiness, cargo worthiness or vessel's trading capability.


## Clause 43 - BIMCO Standard ISM Clause :

From the date of coming into force of the International Safety Management (ISM) Code in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by failure on the part of the Owners or "the Company" to comply with the ISM Code shall be for the Owners' account.


## Clause 44 :

Charterers have the liberty to fumigate the cargo for their account, risk and expense on board the vessel either during loading, or after completion of loading or before or during discharge. Master/Owners not to clause Bills of Lading by reason of such fumigation.

Crew to stay on board during fumigation provided local/health regulation/vessel's P & I Club permit, alternatively, if crew refuse to stay on board although local/health regulation permit, Owners to pay crew accommodation and expenses ashore and time lost due to this to be for Owners' account, if local/health/regulations/P & I Club do not permit stay on board then all such expenses to be for Charterers' account. Also Owners/Master certify that the vessel is in all respects capable and agreeable to "in transit fumigation" with aluminium phosphine/fostoxin or other approved product. Master to be fully advised of fumigation method employed and to confirm understanding of all safety precautions. However any protection material (masks, etc), if so required, to be at Charterers' costs and risk.


## Clause 45 :

Charterers and/or their Agents are hereby authorized to sign on Master's behalf Bills of Lading and Waybills (See Clause 114) as presented in accordance with Mate's receipts without prejudice to this Charter Party but Charterers to be responsible for all consequences that might result from Charterers and/or their Agents signing Bills of Lading and Waybills not adhering to the remarks in the Mate's Receipt. No through Bills of Lading allowed under this Charter Party.


## Clause 46 - Hire :

US$ 11,000 (Eleven Thousand U.S. Dollars) daily including overtime, payable every 15 days in advance. First hire installment plus the value of the bunkers on board on delivery to be paid within 3 banking days after delivery (as defined in Clause 50).


## Clause 47 - BIMCO/LMAA Arbitration Clause :

(a) This Contract shall be governed by and construed in accordance with English law and any dispute arising out of or in connection with this Contract shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause.

The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceedings are commenced.

The reference shall be to three arbitrators. A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within 14 calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and gives notice that it has done so within the 14 days specified. If the other party does not appoint its own arbitrator and give notice that it has done so within the 14 days specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall

advise the other party accordingly. The award of a sole arbitrator shall be binding on both parties as if he had been appointed by agreement.

Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.

In cases where neither the claim nor any counterclaim exceeds the sum of USD 50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

(b) Notwithstanding the above, the parties may agree at any time to refer to mediation any difference and/or dispute arising out of or in connection with this Contract.

In the case of a dispute in respect of which arbitration has been commenced under the above, the following shall apply:-

(i) Either party may at any time and from time to time elect to refer the dispute or part of the dispute to mediation by service on the other party of a written notice (the "Mediation Notice") calling on the other party to agree to mediation.

(ii) The other party shall thereupon within 14 calendar days of receipt of the Mediation Notice confirm that they agree to mediation, in which case the parties shall thereafter agree a mediator within a further 14 calendar days, failing which on the application of either party a mediator will be appointed promptly by the Arbitration Tribunal ("the Tribunal") or such person as the Tribunal may designate for that purpose. The mediation shall be conducted in such place and in accordance with such procedure and on such terms as the parties may agree or, in the event of disagreement, as may be set by the mediator.

(iii) If the other party does not agree to mediate, that fact may be brought to the attention of the Tribunal and may be taken into account by the Tribunal when allocating the costs of the arbitration as between the parties.

(iv) The mediation shall not affect the right of either party to seek such relief or take such steps as it considers necessary to protect its interest.

(v) Either party may advise the Tribunal that they have agreed to mediation. The arbitration procedure shall continue during the conduct of the mediation but the Tribunal may take the mediation timetable into account when setting the timetable for steps in the arbitration.

(vi) Unless otherwise agreed or specified in the mediation terms, each party shall bear its own costs incurred in the mediation and the parties shall share equally the mediator's costs and expenses.

(vii) The mediation process shall be without prejudice and confidential and no information or documents disclosed during it shall be revealed to the Tribunal except to the extent that they are disclosable under the law and procedure governing the arbitration.

## Clause 48 - Protective Clauses :

New Jason Clause, New Both-to-Blame Collision Clause, Conwartime 2004, General Clause Paramount, BIMCO Ice Clause paragraph B, C, D and P & I Bunker Clause to apply. All Bills of Lading and Waybills issued during the currency of the Charter Party are to incorporate the Hague or Hague-Visby Rules. All Bills of Lading issued under this Charter Party shall validly and effectively incorporate all the above.

## Clause 49 :

Bunkers on delivery about 1,100 metric tons HSIFO, about 340 metric tons LSIFO, about 60 metric tons MDO and about 20 metric tons LS MGO.
Bunkers on redelivery about same as actually on delivery.
Bunker prices same both ends US$ 620/700/950/1,000 per metric ton respectively.

Owners' option to bunker for their own account prior to redelivery provided same doesn't interfere with Charterers' operations and/or cargo lift.

Charterers to pay value of bunkers on delivery with first 15 days' hire payment and Charterers' to have the option to deduct value of bunkers on redelivery from last sufficient hire payments.

## Clause 50 :

Hire and all monies due to the Owners under this Charter Party will be paid to Onwers' bank account. No assignment of hire is permitted except with Charterers' consent except when this assignment is in favour of the lending bank.

Hire to be remitted to :

BENEFICIARY: MAXEIKOSIENA SHIPPING CORPORATION
COMMONWEALTH BANK OF AUSTRALIA, LONDON (SWIFT: CTBAGB2L)
ACCOUNT NO. 085036-USD-2408-01
IBAN: GB30CTBA60953808503601
CORRESPONDENT BANK: BANK OF NEW YORK MELLON, NEW YORK (SWIFT: IRVTUS3N)

With reference to Clause 5 hereof,
Where there is failure to make "punctual and regular payment" of hire including first hire payment, due to oversight, negligence, errors or omissions on the part of the Charterers, their bankers or respectively their Agents or otherwise for any reason whatsoever where there is absence of intention to fail to make timely payment, the Charterers shall be given by the Owners 3 (three) banking days written notice to rectify the failure and when so rectified the payment shall stand as punctual and regular.

## Clause 51 :

Time charter hire to include overtime and Charterers are not liable to pay any additional charges for nautical matters such as:

a) Opening and closing of hatches.
b) Shifting operations, docking, bunkering
c) Deleted
d) Supervision of loading and discharging
e) Preparing of hatches as much as possible prior to arrival at ports and commencement of operations.

## Clause 52 :

Owners confirm and warrant that they have not knowingly loaded Iranian or Iranian blended bunkers from any port that remain on the vessel at time of delivery that would be in breach of EU regulation 267/2012 in particular but not confined to Article 11 and Annex IV.
Charterers confirm and warrant that they will not knowingly bunker any Iranian or Iranian blended bunkers from any port onto the vessel after delivery that would be in breach of EU regulation 267/2012 in particular but not confined to Article 11 and Annex IV.

## Clause 53 :

The Charterers shall have the option of holding an inspection of the vessel, its certificates and/or class records at any time of this Charter. The Owners and Master shall give every facility and assistance, which shall not be unreasonably withheld.

Time and cost of survey to be for Charterers' account but the Master to give every facility to the Charterers and their Surveyors to carry out such tests.

The Charterers shall have the option to send their superintended at discharging port to assist communication between crew and Agent, to supervise the discharging operation. The Master and crew to render their cooperation to Charterers' superintendent and provide accommodation/meals if needed.

## Clause 54 - Description :

OWNRS: MAXEIKOSIENA SHIPPING CORPORATION, OF LIBERIA

MANAGERS/CONTACT: SAFETY MANAGEMENT OVERSEAS S.A ATHENS
PHONE: +30 210 895 70 70
FAX: +30 210 895 69 00
E-MAIL: OPERATIONS@SAFETY.GR - OPERATIONS
FIXING@SAFETY.GR - CHARTERING

BROKERS: ACROPOLIS CHARTERING AND SHIPPING INC
16, SKOYZE STR - PIRAEUS 185 36 GREECE
TEL: +30 210 4288068
FAX:210 4288072
E-MAIL: ACRO@OTENET.GR

M/V PEDHOULAS FARMER
CYPRUS FLAG GEARLESS, SELF TRIMMING, SD BULK CARRIER
BUILT ZHEJIANG OUHUA SHIPBUILDING CO., LTD 2012
16 MOORING DRUMS CO2 FITTED IN CARGO HOLDS
VESSEL EQUIPPED WITH SPECIAL DIRTY WATER HOLDING TANK 390 C.M.
(ESSENTIAL FOR LOADING AT EUROPEAN PORTS, AFTER CARGO HOLDS WASHING OF PREVIOUS CARGO)
81,600 MTONS DWAT ON 14.50 M SSW TPC 71.7
LOA 229 M BEAM 32.26 M
7/7 HO/HA WITH 3,390,000 CUBIC FEET GRAIN CAPACITY IN MAIN HOLDS
HATCH DIMENSIONS: NO.1 14.62 X 12.80M NO.2-7 15.48 X 15.00M

SPEED/CONSUMPTION: BASIS GOOD WEATHER CONDITIONS (WIND NOT EXCEEDING BEAUFORT SCALE 4, SEA CONDITION UP TO SEA STATE 3 ON THE DOUGLAS SCALE, AND NO NEGATIVE INFLUENCE OF SWELL / CURRENTS)

BALLAST: ABOUT 11,5 KNOTS ON ABOUT 17,5 MTONS HFO 380CST + 2 MTONS HFO 380CST FOR AUXS
LADEN: ABOUT 11,5 KNOTS ON ABOUT 22 MTONS HFO 380CST + 2 MTONS HFO 380CST FOR AUXS
PORT CONSUMPTION: ABOUT 2 MTONS MDO PER DAY + 0,8MTONS HFO FOR BOILER

BUNKERS SPECIFICATIONS :
AT ALL TIMES CHARTERERS TO SUPPLY HFO 380CST WHICH TO BE AT LEAST IN ACCORDANCE WITH ISO 8217 : 2010 RMG 380
MDO ACCORDING TO ISO 8217 2010 DMB
IF NOT AVAIL THE 2005 TO APPLY
MARPOL ANNEX VI TO APPLY

VESSEL BURNS MDO FOR M/E WHEN MANOUVERING / NAVIGATING IN / OUT PORTS AND IN NARROW / SHALLOW WATERS, RIVERS, CANALS ETC ETC, AND HFO FOR BALLAST WATER EXCHANGE.

CONSTANTS ABOUT 650 MT EXCL FW

ALL DETAILS ABT

CONTACT DETAILS:
TEL: +87773234229 / +87773234228
FAX: +87783207549
E-MAIL: PED.FARMER@GTSHIPS.COM

## Clause 55 :

All liabilities of the cargo claims to be settled on the basis of International P & I Club Agreement of the New York Produce Exchange, form dated February 20th, 1970 and reprinted May 1972 as amended 1984 and any further amendments thereto.

## Clause 56 - Crew War Risk Bonus :

Any crew war bonus paid and additional war risk insurance reasonably incurred due to vessel's trading to be for Charterers' account.

Owners to pay basic war risk insurance and any extra war risk insurance premium required by Owners' underwriters to be for Charterers' account.

Conwartime 2004 War Risk Clause to apply throughout this Charter Party.

## Clause 57 :

Deleted.

## Clause 58 - Bunker Fuel Sulphur Content Clause for Time Charter Parties 2005 :

(a) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone.

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-clause (a).

(b) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that:

(i) the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and
(ii) the Vessel shall be able to consume fuels of the required sulphur content when ordered by the Charterers to trade within any such zone.

Subject to having supplied the Vessel with fuels in accordance with Sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel's failure to comply with Regulations 14 and 18 of MARPOL Annex VI.

(c) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

## Clause 59 :

The Charterers shall have the liberty to order the laying up thereof at a safe berth, or safe port or safe anchorage, for any period of this Charter. If so requested by the Charterers, the Owners shall estimate the savings taking into account reductions in insurance and manning costs as well as extra costs for decommissioning and recommissioning. If the vessel is laid up, the Charter hire shall be reduced by the estimated savings as given by the Owners prior to lay-up for such laying up period. The place/port of lay-up will always be safe for the vessel/crew. It is clearly understood that the manning and any other matter related to the vessel's/crew safety shall remain at Owners' discretion.

## Clause 60 :

Any taxes levied by any government other than that of Owners' domicile or ship's flag in respect of the earnings of the vessel whilst under this Time-Charter shall be for Charterers' account.

## Clause 61 :

At all times Charterers to supply HFO 380CST which to be at least in accordance with ISO 8217 : 2010 RMG 380.
MDO according to ISO 8217 : 2010 DMB.
If not available, the 2005 specification to apply.

A) At the time of delivery of the vessel the Owners shall place at the disposal of the Charterers the bunker delivery note(s) and samples of the bunkers supplied on delivery which shall be taken at the vessel's bunker manifold and sealed in the presence of Charterers.

B) During the currency of the Charter the Charterers shall ensure that bunker delivery notes are presented to the vessel on delivery of fuel(s) and that during bunkering representative samples of the fuel(s) supplied shall be taken at the vessel's bunker manifold and sealed in the presence of competent representatives of the Charterers and the vessel.

C) Fuel samples shall be retained by the vessel for 90 (ninety) days after the date of delivery or for whatever period necessary in the case of a prior dispute and any dispute as to whether the bunker fuels confirm to the agreed specification(s) shall be settled by analysis of the sample(s) by mutually agreed fuels analyst whose findings shall be conclusive evidence as to conformity or otherwise with the bunker fuels specification(s).

D) The Owners reserve their right to make a claim against the Charterers for any damage to the main engines or the auxiliaries caused by the use of unsuitable fuels or fuels not complying with the agreed specification(s).

Additionally, if bunker fuels supplied do not conform with the mutually agreed specification(s) or otherwise prove unsuitable for burning in the ship's engines or auxiliaries the Owners shall not be held responsible for any reduction in the vessel's speed performance and/or increased bunker consumpiton or for any time lost and any other consequences.

Charterers to always supply bunkers as per specifications agreed in this Charter Party.

## Clause 62 :

Owners guarantee that vessel has clear holds and is suitable for grab discharge without extra expense.

## Clause 63 :

Either party to have the opportunity of cancelling this Charter or any remaining portion thereof if war breaks out between any two of the following countries directly affecting this Charter Party: United Kingdom, France, Germany, China, United States of America, Japan, Australia, Canada.

## Clause 64 :

The Charterers to pay to the Owners for all radiograms, telephone calls, telexes for the Charterers' business and all entertainment expenses including victualling for the Charterers' account at US$ 1,500 lumpsum per 30 days, pro rata.

## Clause 65 :

No deck cargo.

## Clause 66 :

Vessel is suitable for bulldozers discharge subject to tank top strength.

## Clause 67 :

Owners to arrange at their expense that Master, Officers and crew of vessel hold valid vaccination certificates or other necessary health certificates, if required, during this Charter.

## Clause 68 :

Watchmen for gangway from crew to be for Owners' account, but for cargo to be for Charterers' account. Watchmen required or compulsory watchmen to be for Charterers' account.
 In case of calling U.S. ports, any compulsory extra watchmen required due to crew nationality or any expense required to obtain crew visa, including extra compulsory watchmen if required by local custom/ port regulations, to be for Owner's account.

## Clause 69 :

It is understood that only boatage for Owners' business as well as vessel's Officers/crew used as conveyance to be for Owners' account, all other boatage to be for Charterers' account.

## Clause 70 :

Owner represents and guarantees that Owners and its vessel are not in any way directly or indirectly owned, controlled by or related to any Cuban, North Korean or Iraqi interests. Owner represents and guarantees that the vessel has not called at a Cuban port within 180 days of the vessel's estimated arrival at a U.S. port.

## Clause 71 :

The Owners shall provide and pay for insurance on the Vessel fully covering P & I risks and standard oil pollution cover up to the level customarily offered by the International Group of P & I Clubs, Hull & Machinery and War Risks.

## Clause 72 - Cargo Exclusions :

All cargoes carried under this Charter Party are in bulk/harmless.

The vessel shall be employed in carrying lawful merchandise excluding any goods of a dangerous, injurious, flammable or corrosive nature. Without prejudice to the generality of the foregoing, in addition the following are specifically excluded:

Livestock of any description, arms, ammunition, explosives (black powder, blasting caps, loaded bombs, detonators, dynamite, TNT), nuclear and radioactive materials and its waste, tar in bulk, blocks, hot briquetted iron, petroleum and its by-products, pitch in bulk, borax in bulk, bitumen, quebracho, sodium sulphate, calcium hydrochloride, bonemeal, charcoal, limestone, turpentine, ferro silicon, resin, cotton, nitrate, lime, Chilean nitrate, copra, pond coal, pebbles, brown coal, Indian coal (well understood that it means coal loaded in India), sponge iron, asphalt, sunflower seed expellers, ammonium nitrate, naphtha and its products, cement, cement clinker, direct reduced iron, direct reduced iron products, direct reduced iron ore pellets, steels, steel products, sulphur, salt/rock salt, nickel ore, asbestos, fishmeal, wet hides, creosoted goods, calcium carbide, motor spirits, industrial waste, acids, logs, lumber, all kinds of concentrates, all kinds of nitrates and sulphates, slags, granite, gypsum, soda ash, scrap including motor blocks and turnings, all kinds of expellers, oilcakes, seedcakes. Any and all cargoes belonging to Appendix "B" of BC Code. One (1) cargo of petcoke and two (2) of pig iron allowed during the currency of this Charter Party, with Owners' protective clauses to apply.

Iron ore concentrates allowed.

Soya beans, soya bean meal, soya bean meal pellets allowed provided they are loaded in accordance with IMO regulations.

Fertilizers to Australia not allowed under this Charter Party.

Dap and mop allowed.

Petcoke not to be loaded as last cargo under this Charter Party.
Petcoke/pig iron protective clause as per Charter Party.

Protective Clause for loading petcoke :

Petcoke loading
(a) The petroleum coke mentioned herein is only limited to petroleum coke of harmless/non-oily/non-hazardous/non-dangerous green delayed type.

(b) Charterers undertake to use holds as less as possible, provided vessel's stability trim and stress permitting.

(c) Such cargo to be loaded/stowed/trimmed/discharged strictly according to latest IMO and/or any other latest regulations/rules applicable to such cargo.

(d) Temperature of the cargo at the time of loading not to exceed 55 degrees Celsius.

(e) Should any additional/special wash down of holds before loading be recommended/proposed/required by Master, Charterers undertake to arrange the same at their expense/time.

(f) Charterers to arrange and remain responsible for cleaning holds after discharge to Master's satisfaction including chemical cleaning if necessary, all costs, time and expenses to be for Charterers' account.

(g) In case the vessel is not equipped with high pressure hoses, Charterers are to provide same so that vessel's holds can be thoroughly cleaned after discharge petcoke.

(h) If vessel should fail subsequent survey all time and expenses involved in passing survey to be for Charterers' account.

(i) Charterers are allowed to use ship's crew to perform cleaning following the carriage of petcoke, against paying US$ 700 per hold in addition to the normal intermediate hold cleaning allowance, but always subject to prior consent of Master/crew and local regulations permitting, and all time used to be for Charterers' account. All necessary materials, tools and equipment required to be supplied by Charterers in accordance with Master's requirement. Owners/Master are not held responsible for passing hold cleanliness for loading next cargo and for any consequences whatsoever caused due to such arrangement.

(j) Petcoke not to be last cargo prior redelivery. Calcined petcoke always excluded.

No pig iron allowed from Ponta da Madeira.

Pig Iron :
If pig iron is loaded, Charterers to ensure that enough cargo is lowered into the vessel's holds and placed on tank tops so as to produce a sufficient bedding in order to protect vessel's tanktops and holds, to Master's satisfaction. Charterers to place sufficient pallets on tanktops to provide cushion for first layer. Charterers to be responsible for removal of any dunnage following discharge including associated costs. Understand pig iron from Ponta da Madeira is always excluded.

## Clause 73 - Split Bills of Lading Clause :

Charterers and/or Agents hereby authorized by Owners/Master to split Bills of Lading and issue ship delivery orders in negotiable and tranferable form against collection of full set of original Bills of Lading. Delivery orders to conform with all terms and conditions and exceptions of Bills of Lading and shall not prejudice Ship Owners' rights.

## Clause 74 :
Deleted.

## Clause 75 - USCG Compliance Clause :

Owners warrant that during the term of the Charter, the vessel shall be in full compliance with all U.S. Coast Guard Pollution and Safety Regulations as contained in, but not limited to, Titles 33 and 46 of the Code of Federal Regulations, as amended.

Any and all delay to the vessel resulting from such non-compliance shall not count as laytime or, if laytime has expired, as time on demurrage.

Also the Owners recognize that the flag state of the vessel is on the USCG Targeted List of Flag States. As the Owners are aware, this means that the vessel will be subject to a strict USCG inspection before being allowed to commence cargo operations in the U.S.

Any time lost as a result of the inspection or the inspection procedure will be for the Owners' account and, if any deficiencies are found and have to be corrected before the commencement of cargo operations, any time lost to be for Owners' account.

## Clause 76 - Separations :

Separations if any, to be for Charterers' time, risk and expense, unless they are required by Owners/ Master or by reason of vessel's stability and/or safe trim, in which case they are to be for Owners'/vessel's risk and expense and any time lost is not to count as laytime on demurrage, provided one cargo to be loaded.

## Clause 77 - Stability :

Vessel has on board an approved trim and stability manual in accordance with the requirement of Chapter VI SOLAS Regulations 1974 and IMCO document BCXIX/INV.4 (concerning "filled holds ends untrimmed").

## Clause 78 :

Owners warrant that the vessel has on board "The International Tonnage Certificate 1969" in full accordance with IMO requirements and the International Convention on Tonnage Measurement of Ships, 1969.

## Clause 79 - Double Banking Clause :

(a) The Charterers shall have the right, where and when it is customary and safe for vessels of similar size and type to do so, to order the Vessel to go, lie or remain alongside another barge or floating crane at such safe dock, wharf, anchorage or other place for loading/discharging of cargo and/or bunkering.

(b) The Charterers shall pay for and provide such assistance and equipment as may be required by Master to enable any of the operations mentioned in this clause safely to be completed and shall give the Owners such advance notice as they reasonably can of the details of any such operations.

(c) Without prejudice to the generality of the Charterers' rights under (a) and (b), it is expressly agreed that the Master shall have the right to refuse to allow the Vessel to perform as provided in (a) and (b) if in his opinion it is not safe so to do and if the weather/sea conditions deteriorates has the right at any time to order his vessel to sail if he considers it unsafe for his vessel to remain double banked. Master's action will not interrupt hire from running.

(d) The Owners shall be entitled to insure any deductible under the Vessel's hull policy and the Charterers shall reimburse the Owners any additional premium(s) required by the Vessel's Underwriters and/or the cost of insuring any deductible under the Vessel's hull policy.

(e) The Charterers shall further indemnify the Owners for any costs, damage and liabilities resulting from such operation. The Vessel shall remain on hire for any time lost including periods for repairs as a result of such operation.

## Clause 80 :

Vessel's Officers and crew to be manned and controlled in accordance with International Transport Workers Federation recommendations. In the event of the vessel being boycotted, delayed or rendered inoperative by strikes, labour stoppages, or by any other difficulties due to ownership, crew, or any other vessel under the same ownership, operation or control, all time lost is to be considered as off hire.

## Clause 81 :

Owners warrant that the vessel is in all respects eligible for trading to the ports, places or countries specified in this Charter Party and that at all necessary times the vessel and/or Owners shall have all valid, records documents required for such trade.

## Clause 82 :

Should original Bills of Lading not arrive at discharge ports in time, entire cargo to be released against Charterers' single Letter of Indemnity in Owners' P and I Club wording. Letter of Indemnity to be signed by Charterers only.

## Clause 83 - Small Cranes Clause :

Charterers shall have the option of placing small cranes on vessel's main deck to facilitate loading/ dischargin operations in Thailand and Taiwan. Weight of crane(s) are not to exceed vessel's deck strength. Charterers are to put adequate fendings/protections and dunnage underneath the cranes, so that the weight of the crane is uniformly spread on the deck to Master's satisfaction. It is explicitly agreed that no welding of these cranes or their accessories/equipment will take place on vessel's deck, coamings or hatch covers and no cutting to vessel's fittings and/or equipment is allowed to facilitate placement of such cranes on board.
Above method of discharge with small cranes places on board is always at Charterers' time, risk and expenses.

It is explicitly understood that no detachment/removal of hatch covers are allowed under this Clause.

## Clause 84 :

Deleted.

## Clause 85 :

Notwithstanding anything else contained in this Charter Party all costs or expenses arising out of, or related to security regulations or measures required by any U.S. authority shall be for the Charterers' account.

## Clause 86 :

Deleted.

## Clause 87 :

All Bills of Lading and Waybills issued under this Charter Party must contain the following clause :
Any dispute under this bill of lading including matters of general average shall be decided according to English law to the exclusive jurisdiction of the court of justice in England.
All terms and conditions, liberties and exceptions of charter party between Head Charterers and Owners including the law and arbitration clause are herewith incorporated.

## Clause 88 :

Owners not to be responsible for any decrease in speed/increase in consumption of the vessel whether permanent or temporary cause by Charterers if vessel stays more than 25 days idle in tropical/non tropical waters. In such a case cleaning to be done in Charterers' time and expense.

## Clause 89 - Bulk Carrier Safety Clause :

(a) The Charterers shall instruct the Terminal Operators or their representatives to co-operate with the Master in completing the IMO SHIP/SHORE SAFETY CHECKLIST and shall arrange all cargo operations strictly in accordance with the guidelines set out therein.

(b) In addition to the above and notwithstanding any provision in this Charter Party in respect of loading/ discharging rates, the Charterers shall instruct the Terminal Operators to load/discharge the Vessel in accordance with the loading/discharging plan, which shall be approved by the Master with due regard to the Vessel's draught, trim, stability, stress or any other factor which may affect the safety of the Vessel.

(c) At any time during cargo operations the Master may, if he deems it necessary for reasons of safety of the Vessel, instruct the Terminal Operators or their representatives to slow down or stop the loading or discharging.

(d) Compliance with the provisions of this Clause shall not affect the counting of laytime

## Clause 90 - BIMCO ISPS/MTSA Clause for Time Charter Parties 2005 :

a) (i) The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

(iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

(b) (i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all sub-charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".

(ii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

## Clause 91 - BIMCO U.S. Customs Advance Notification/AMS Clause

(a) If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

i) Have in place a SCAC (Standard Carrier Alpha Code);
ii) Have in place an ICB (International Carrier Bond);
iii) Provide the Owners with a timely confirmation of i) and ii) above; and
iv) Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

## Clause 92 :

Deleted.

## Clause 93 :

Deleted.

## Clause 94 :

For Colombia trading

1. Installation of mooring bits on deck is allowed under the following condition.

Time, risk and expenses for loading of such mooring bits, installation, removing, discharging, repairing and any work related to this installation, to be for Charterers' account. Charterers is fully responsible for any and all damages and consequence, and those expenses to be for Charterers' account. Charterers is responsible for recovering to its original condition after removing such mooring bits.

Supervising of class surveyor to be done from decision of the place of installation until confirmation of recovery status after removing. And such certificate of confirmation from class surveyor is required.

Painting of top side tank to be applied and recovered to original condition.

Charterers to inform us name of LR surveyor who will attend and instructions of the place and means of installation.

2. Charterers warrant to take all possible measures to prevent drugs to go or concealed on board the vessel. Non compliance with the provisions of this clause shall amount to breach of warranty for the

consequences of which Charterers shall be liable and shall hold the Owners/Master and crew of the vessel harmless and indemnified against all claims whatsoever which may and be made against them individually or jointly. Furthermore all time lost and all expenses incurred, including fines shall be for Charterers' account and vessel will remain on hire.

## Clause 95 - BIMCO Conwartime 2004 :

(a) For the purpose of this Clause, the words:

(i) "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

(ii) "War Risks" shall include any actual, threatened or reported:

war; act of war; civil war; hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy; acts of terrorists; acts of hostility or malicious damage; blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever); by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(b) The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(c) The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerent's right of search and/or confiscation.

(d) (i) The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their protection and Indemnity Risks), and the premiums and/or calls therefor shall be for their account.

(ii) If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then the actual premiums and/or calls paid shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(e) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(f) The Vessel shall have liberty:-

(i) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(ii) to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(iii) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national

laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(iv)  to discharge at any other port any cargo or part thereof which may  render the Vessel liable to confiscation as a contraband carrier;

(v)  to call at any other port to change the crew or any part thereof or  other persons on board the Vessel when there is reason to believe  that they may be subject to internment, imprisonment or other  sanctions.

(g)  If in accordance with their rights under the foregoing provisions of this  Clause, the Owners shall refuse to proceed to the loading or discharging  ports, or any one or more of them, they shall immediately inform the  Charterers. No cargo shall be discharged at any alternative port without  first giving the Charterers notice of the Owners' intention to do so and  requesting them to nominate a safe port for such discharge. Failing such  nomination by the Charterers within 48 hours of the receipt of such notice  and request, the Owners may discharge the cargo at any safe port of their  own choice.

(h)  If in compliance with any of the provisions of sub-clauses (b) to (g) of this  Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

## Clause 96 - BIMCO Weather Routing Clause for Time Charter Parties :

(a) The Vessel shall, unless otherwise instructed by the Charterers, proceed by the customary route, but the Master may deviate from the route if he has reasonable grounds to believe that such a route will compromise the safe navigation of the Vessel.

(b) In the event the Charterers supply the Master with weather routing information, the Master shall follow the reporting procedures of and the advice given by the Weather Routing Company (WRC) except for reasons of safety, in which case this is to be clearly and promptly communicated both to Charterers and to the WRC.

## Clause 97 :

The Charterers may supply an independent weather bureau advice to the Master, During voyage specified by the Charterers. The Master at his sole discretion shall comply with the reporting procedure of the routing service selected by Charterers. Evidence of weather conditions shall be taken from the vessel's deck logs and Independent weather bureau reports. In the event of a consistent discrepancy between the deck logs and the Independent weather reports, the Independent weather bureau reports shall be taken as ruling. For the purpose of this Charter Party "good weather conditions" are to be taken as wind speed not exceeding Beaufort Scale 4, sea condition upto sea state 3 on the Douglas scale and no adverse current or influence of swell".

No hire to be deducted for alleged underperformance claim until it has been agreed  by both parties amicably, reasonably. In the event of disagreement and if an amicable solution can not be found then, Charterers to deduct amount of unsettled underperformance claim from last sufficient hire payment(s) before redelivery.

In case of relet the last paragraph should read:
"No hire to be deducted for alleged underperformance claim until it has been agreed by both parties. In the event of disagreement and if an amicable solution cannot be found then matter to be referred to arbitration".

## Clause 98 :

Deleted.

## Clause 99 :

Charterers have the liberty to relet any counter parties for periods up to 6 months. For longer periods relet to be discussed later.

## Clause 100 :

Charterers have the option to add all off-hire period including drydocking, but such option to be declared 30 (thirty) days prior to the expiration of the Charter period.

## Clause 101 - Arrest, Requisition, Seizure :

a) Arrest Clause

Should the vessel be arrested during the currency of this Charter at the suit of any person having claim against the vessel, hire under this Charter shall not be payable during this arrest, unless vessel remain in Charterers' use, and any bunkers consumed and vessel's expenses incurred shall be for Owners' account, unless such arrest is due to the default of Charterers or their agents in which case any and all claims, liabilities, cost (including legal fees), fines and any and all direct related resulting from an arrest to be for Charterers' account and vessel to remain on hire.

b) Requisition Clause

Should the vessel be requisitioned by any government or governmental authority during the period of this Charter, she shall be off-hire during the period of such requisition. If the vessel is requisitioned for a continuous period exceeding 75 days, then Charterers to have the option of cancelling this Charter.

c) Seizure/Detention due to Ownership and/or Flag and/or Registry

Should the vessel be seized or detained or embargoed due to her flag, registry or ownership during the currency of this Charter, the vessel to be off-hire immediately from the time of her seizure or detention or embargo until the vessel returns to Charterers' disposal. Unless such detention or embargo or seizure is occasioned by any personal act or omission or default of the Charterers or their agents, in which case all claims, losses, damages, liabilities, costs to be for Charterers' account and vessel to remain on hire.

## Clause 102 :

Deleted.

## Clause 103 :

Deleted.

## Clause 104 :

Deleted.

## Clause 105 - Drug and Alcohol Clause :

The Owners undertake to the Charterers that it has guidelines on drug and alcohol abuse applicable to the vessel, Owners' Agents, subcontractors, servants and employees with the objective that non of the Owners' Agents, subcontractors, servants and employees will navigate a ship or operate its onboard equipment while impaired by drugs or alcohol and that none of the Owners' Agents, subcontractors, servants and employees will have the use or possession of or the opportunity to sell or distribute or transport illicit or non-prescribed drugs aboard the vessel. Further, the Charterers expects that the Owners exercise due diligence throughout the period of the Contract to ensure that such guidelines are complied with by the Owners' Agents, subcontractors, servants and employees.

## Clause 106 - Entire Contract :

This Charter Party hereto which form part of it constitutes the entire contract between the parties and each party acknowledges that in entering into this Charter Party it has not relied on any representation, understanding or agreement, oral or written, other than as expressly provided in this Charter Party and waives all rights and remedies which might otherwise be available to it in respect thereof, provided always, that nothing in the Charter Party shall limit or exclude any liability of a party for fraud.

## Clause 107 - Communications :

The English language will be used in notices, letters, telexes and all other means of communication between parties, in this Charter Party:

(a) Without prejudice to any other mode of service, notices shall be deemed to be properly given if sent by e-mail or facsimile to the intended recipient at its then current cable or facsimile address to the recipient in the Charter Party.

(b) Subject to this Clause, any party hereto by notice to the other may change its address from that set out to such other address as is specified in the notice.

(c) Notices given in accordance with this Clause shall be deemed to have been properly given to the addressee in the ordinary course of transmission if by any means other than by post or, if given by post, four days after the date of posting.

(d) Owners' address for purpose of service is:
Safety Management Overseas S.A.
32, Karamanli Avenue,
166 73, Voula, Athens, Greece
Tel: +30 211 1888 400 Fax: +30 211 1878 510 email: operations@safety.gr

## Clause 108 - Clause Paramount :

General Clause Paramount, U.S.A. Paramount, as attached hereto, are to be considered part of this time Charter Party and same are to be incorporated into any Bills of Lading and/or Waybills issued hereunder.

## Clause 109 - Slow Steam :

Charterers have the option to slow steam vessel at any time during the course of this Charter Party on the basis of speeds and consumption which to be advised, but always within a range of safe, operable and harmless to the engine.

## Clause 110 - Metric Tons :

Whenever tons are referred to in this Charter Party, same are understood to be metric tons unless otherwise stated.

## Clause 111 :

Master/Officer/crew are to strictly observe regulations, rules at discharging port terminal.

## Clause 112 - Cargo Temperatures :

The vessel will be required to carry on board appropriate instruments for measuring concentrations of methane, oxygen and carbon monoxide, the "ph" value of hold bilge water sample and cargo temperatures in the range of 0-100 degrees centigrade without requiring entry into cargo spaces.

## Clause 113 :

Deleted.

## Clause 114 - Sea Waybill Clause :

The Master shall sign Bills of Lading or Sea Waybills for cargo as presented in strict accordance with Mate's/Tally Clerk's receipts. However, Charterers may sign Bills of Lading or Sea Waybills on the Master's behalf with Owners' prior written authority, always in accordance with Mate's/Tally Clerk's receipts.

Charterers are permitted to use non negotiable general Sea Waybills for the purpose of this Charter, always provided the Consignee's name and address is entered on the Sea Waybill on issue and the Charterers' instructions is that the cargo is to be delivered to that named Consignee. The Sea Waybill to be BIMCO "Genwaybill" form incorporating The Hague Visby Rules and all the clauses of the Charter Party, including the Arbitration London/English Law Clause.

Charterers to use BIMCO "Genwaybill" issued by BIMCO subject to the CMI Uniform Rules for Sea Waybills with the following "Transfer of Control Clause" incorporated.

"It is hereby noted that the shipper has irrevocably transferred the right of control (of disposal) of the goods to the Consignee under Rule 6 (II) of the CMI Uniform Rules for Sea Waybills. The carrier will hold the goods to the order of the Consignee subject to any lien in favour of the carrier."

## Clause 115 :

Vessel is not black listed at Newcastle, New South Wales, Australia.

## Clause 116 :

This Charter Party and any addendum thereto shall be governed by and construed in accordance with English law.

## Clause 117 - Dry dock Clause :

Drydocking allowed only in case of emergency.

## Clause 118 :

Charterers will not require vessel to call at any port or place where radiation levels are above the level allowed by the World Health Organization and/or International Atomic Energy Agency.

## Clause 119 :

Charterers will not trade to any place/port where vessel will be in breach of any resolutions/directives/ laws/regulations etc. issued by UN/US/EU/UK, flag or other applicable authority.

## Clause 120 - Cargo Safety Clause :

Unless the cargo is elsewhere excluded in this Charter Party, the vessel may load any lawful, properly certified, safe, cargo in compliance with applicable regulations of the International Maritime Solid Bulk Cargoes Code (IMSBC Code) IMO Code of Safe Practice for Solid Bulk Cargoes (BC Code) prior to January 2011 or any subsequent revisions thereof and applicable local regulations in effect at the time of loading.
In case of conflict between IMSBC Code and local regulations then the IMSBC Code to apply.

At Owner's/Master's request, Charterers/shippers to identify the cargo to be loaded and jointly with Owners (or their agents or P&I Club representative) take representative samples. Such sample(s) to be tested/analysed in a mutually acceptable, competent laboratory before the ship is called to berth to determine whether the cargo is safe to load. For cargoes that may be subject to liquefaction, this will include testing/analysis of the flow moisture point, the transportable moisture limit and the actual moisture content. The results of such testing/analysis to be binding on all parties.

At Owner's/Master's request, Charterers and/or shippers shall provide to the Master before loading, complete and valid certification for all cargo intended for loading, as per the foregoing. The certificate(s) will remain valid for such period as defined by the IMSBC Code or applicable local regulations, whichever is the shorter. The vessel shall have the right to refuse to commence loading if such certification is not provided or the validity of which has expired, before loading and time will continue to count (or the vessel shall remain on hire, as applicable).

Any time lost or cost incurred as a result of shippers'/Charterers' failure to comply with this clause will be for Charterers' account.

## New Both-To-Blame Collision Clause :

If the liability for any collision in which the vessel is involved while performing this Charter Party falls to be determined in accordance with the laws of the United States of America, the following clause shall apply:

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the Owners of the goods carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the Owners of the said goods, paid or payable by the other or non-carrying ship or her Owners to the Owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying ship or Carrier. The foregoing provisions shall also apply where the Owners, Operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact."

and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

## General Clause Paramount :

The Bills of Lading shall have effect subject to the provisions of any legislation incorporating the rules contained in the international convention for the unification of certain rules relating to Bills of Lading, dated Brussels, 25th August, 1924 (the Hague Rules) or those rules as amended by the protocol signed at Brussels, February 23rd 1968 (The Hague Visby Rules) and which is compulsory applicable, the Hague Rules as enacted in the country of the port of loading shall apply. When no such enactment is in force in the country of the port of loading, the Hague or Hague Visby Rules to apply and in the absence of any such legislation, the terms of the 1924 convention as amended by the 1986 Protocol shall apply.

## New Jason Clause :

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever whether due to negligence or not, for which, or for the consequence of which, the Carrier is not responsible, by statute, contract or otherwise, the goods, Shippers, Consignees, or Owners of the goods shall contribute with the Carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods. If a salving ship is owned or operated by the Carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the Carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, Shippers, Consignees or Owners of the goods to the Carrier before delivery".

and the Charterers shall procure that all Bills of Lading issued under this Contract shall contain the same clause.

## P. & I. Bunker Clause :

The Vessel shall have liberty as part of the contract voyage and at any stage thereof to proceed to any port or ports whatsoever whether such ports are on or off the direct and/or customary route or routes to the ports of loading or discharge named in this Charter Party and there take oil bunkers in any quantity in the discretion of Owners even to full capacity of fuel tanks, deep tanks and any other compartment in which oil can be carried whether such amount is or is not required for the chartered voyage.

### BIMCO Ice Clause for Time Chartering :

(a) Deleted.

(b) The Vessel shall not be required to enter or remain in any icebound port or area, nor any port or area where lights, lightships, markers or buoys have been or are about to be withdrawn by reason of ice, nor where on account of ice there is, in the Master's sole discretion, a risk that, in the ordinary course of events, the Vessel will not be able safely to enter and remain at the port or area or to depart after completion of loading or discharging. If, on account of ice, the Master in his sole discretion considers it unsafe to proceed to, enter or remain at the place of loading or discharging for fear of the Vessel being frozen in and/or damaged, he shall be at liberty to sail to the nearest ice-free and safe place and there await the Charterers' instructions.

(c) Any delay or deviation caused by or resulting from ice shall be for the Charterers' account and the Vessel shall remain on-hire.

(d) Any additional premiums and/or calls required by the Vessel's underwriters due to the Vessel entering or remaining in any icebound port or area, shall be for the Charterers' account.



# EMERALD 82

## MV PEDHOULAS FARMER

CYPRUS FLAG GEARLESS, SELF TRIMMING, SD BULK CARRIER
BUILT ZHEJIANG OUHUA SHIPBUILDING CO., LTD – SEPTEMBER 2012
CLASS LR + 100A1
**16 MOORING DRUMS – CO2 FITTED IN CARGO HOLDS**
**VESSEL EQUIPPED WITH SPECIAL DIRTY WATER HOLDING TANK 390 C.M.**
**(essential for loading at European ports, after cargo holds washing of previous cargo)**

**81,600  MTONS DWT ON 14.50 M SSW**
**LOA** 229 M **BEAM** 32.26 M
7/7 HO/HA WITH **3,390,000** CUBIC FEET GRAIN CAPACITY IN MAIN HOLDS

<u>HATCH DIMENSIONS:</u>    No.1    14.62 x 12.80M
                                 No.2-7  15.48 x 15.00M

<u>SPEED/CONSUMPTION:</u>    BASIS GOOD WEATHER CONDITIONS (WIND NOT EXCEEDING
BEAUFORT SCALE 4, SEA CONDITION UP TO SEA STATE 3 ON
THE DOUGLAS SCALE, AND NO NEGATIVE INFLUENCE OF
SWELL / CURRENTS)

<u>BALLAST:</u>   ABOUT **11,5 KNOTS** ON ABOUT **17,5 MTONS** HFO 380CST + **2 MTONS** HFO
380CST FOR AUXS

<u>LADEN :</u>   ABOUT **11,5 KNOTS** ON ABOUT **23 MTONS** HFO 380CST + **2 MTONS** HFO
380CST FOR AUXS

<u>PORT CONSUMPTION:</u> ABOUT 2 MTONS MDO PER DAY + 0,8MTONS HFO FOR BOILER

<u>BUNKERS SPECIFICATIONS :</u>
AT ALL TIMES CHARTERERS TO SUPPLY HFO 380CST WHICH TO BE AT LEAST IN ACCORDANCE
WITH ISO 8217 : 2010 RMG 380

*MDO ACCORDING TO ISO 8217 2010 DMB*

*MARPOL ANNEX VI TO APPLY*

*VESSEL BURNS MDO FOR M/E FOR MANOUVERING / NAVIGATING IN / OUT PORTS AND IN
NARROW / SHALLOW WATERS, RIVERS, CANALS, CHEMICALS FOR SLOWSTEAMING AND HFO
FOR BALLAST WATER EXCHANGE.*

*CONSTANTS ABOUT 650 MT EXCL FW*

*ALL DETAILS AND PERFORMANCE FIGURES ARE "ABOUT", GIVEN IN GOOD FAITH, WOG.*

 ADMIntermare

**ADMIntermare**, a division of
ADM International Sàrl
A One Business Center
La Pièce 3
CH-1180 Rolle • Switzerland
Telephone: +41 21 702 8000
Fax:        +41 21 702 8042

**Postal:**
Societa' Commerciale E Finanziaria S.R.L.

Via Filippo Turati 26
MILANO
20121
ITALY

**Contract Partner:**
Societa' Commerciale E Finanziaria S.R.L.

Via Filippo Turati 26
MILANO
20121
ITALY

Statement Date : 26Oct2015
Statement No  : 9083262
Our Reference  : 2015/3303
Payment No.    : 1

VAT No. : IT12945110158

## 1ST HIRE PYMENT ADVICE - 130569

| | |
|---|---|
| *C/P Date:* | *22Oct2015* |
| *Vessel:* | *PEDHOULAS FARMER* |
| *Charterer:* | *ADMIntermare a Division of ADM INTERNATIONAL SARL* |

NOTE ALL VALUES ARE IN USD

| | DR | CR |
|---|---|---|
| Charter Hire: 25Oct2015 6:30 to 9Nov2015 6:30 (15,000000 Days) @ 10.750,00 USD Daily | | 161.250,00 |
| Address Commission of 3,750% | 6.046,88 | |
| Collect Commission of 1,250% | 2.015,63 | |
| CVE: 25Oct2015 6:30 to 9Nov2015 6:30 (15,000000 Days) @ 1.500,00 USD per Calendar month | | 725,81 |
| BOD : 1.730,417 MT IFO @ 240,00 USD/MT | | 415.300,08 |
| BOD : 166,500 MT LSG @ 500,00 USD/MT | | 83.250,00 |
| Net Debits / Credits | 8.062,51 | 660.525,89 |
| **BALANCE DUE TO OWNERS** | **652.463,38** | |
| | 660.525,89 | 660.525,89 |
| | | E.&O.E. |
| **REMITTANCE TOTAL** | **652.463,38** | |

| |
|---|
| DUE DATE : 26Oct2015 |
| IMO NO: 9589267   CP dd 22Oct2015 |

**PLEASE SETTLE AS BELOW:**

Intesa Sanpaolo S.P.A.
IBAN: IT18A0306901400161009357463
ACCT. NO: 161009357463
SWIFT/BIC: BCITITMM
in favour of: Societa Commerciale E Finanziaria S.R.L., Via Filippo Turati 26, 20121
Milano, Italy
VIA BANK:
The Bank of New York, NY
IBAN: IRVTUS3N

Continued...



Registered in Switzerland N° CH-550.1.052.13-9
VAT N° CHE-113.903.606 TVA

 ADMIntermare

ADMIntermare, a division of
ADM International Sàrl
A One Business Center
La Pièce 3
CH-1180 Rolle • Switzerland
Telephone: +41 21 702 8000
Fax: +41 21 702 8042

 INTESA 🏛 SANPAOLO

Vi invitiamo a prendere nota delle seguenti informazioni relative all'operazione sotto indicata che apparirà
nell'estratto conto del CONTO in **USD** n.° **IT18A0306901400161009357463-USD-SOCIETA' COMMERCIALE E FINANZIARIA**
presso la **INTESA SANPAOLO SPA** - filiale 01400 di **GENOVA**
intestato a **SOCIETA' COMMERCIALE E FINANZIARIA**

| Data Operazione | Data Valuta | Importo a vs debito | Importo a vs credito | Causale | Descrizione Movimento |
|---|---|---|---|---|---|
| 26.10.2015 | 28.10.2015 | | 652.463,38 | ZI-Bonifico dall'estero | Riferimento cliente: D03529903 Descrizione movimento: ADM INTERNATIONAL SARL CRO operazione interbancaria: 0030302015102612 Info movimento: _Motivo Pagamento : IMO 9589267 CP DD 22.10.15 _Beneficiario : SOCIETA' COMMERCIALE E FINANZIAR |